———o———

STATE OF MISSOURI, Respondent, vs. JAMES F. BROWN, Appellant.

| 64 | 367 |
| 97 | 173 |
| 64 | 367 |
| 108 | 150 |
| 64 | 367 |
| 124 | 668 |
| 64 | 367 |
| 162 | 317 |

1. *Practice, criminal—Indictment—Pleas in abatement—What insufficient.*—Pleas in abatement to an indictment on the grounds that one of the grand jurors returning the same was not a freeholder or householder of the county; that he was not selected as a grand juror by the county court, and that defendant was not present when that jury was sworn so as to challenge said juror or the array, are bad on demurrer.

2. *Indictment for murder—Exclamation after killing that deceased had a knife not res gestæ.*—On an indictment for murder, the testimony that witness heard a little girl, after the killing, exclaim " Mr. L. (meaning the deceased) had a knife in his hand," was held inadmissible. Such exclamation is no part of the *res gestæ.*

3. *Homicide, trial of—Jury—Proof that they were on site of casualty—Effect of.*— Proof of the fact that on trial of an indictment for homicide, the jury were on the ground where the killing took place, where it did not appear that they were looking at the ground with a view to understanding how the deed was done, nor that they said anything about it or conversed among themselves about the ground, and there was no question as to the locality of the homicide, or that the witness testifying thereto was in a position to see what he related, will not authorize a new trial.

4. *Evidence—Falsus in uno, etc.*—An instruction which tells a jury that they may disregard the testimony of a witness who has testified falsely in any particular, without describing such testimony as wilfully or intentionally false, is improper; but the giving of such instruction will not operate a reversal, where it does not appear to have wrought injury to the appellant.

5. *Criminal law—Murder—Self defense—Doctrine of, when may be invoked.*— When defendant, in an indictment for homicide, brings on or voluntarily enters into a difficulty which results in the death of his antagonist, however high the passion of defendant or however imminent the danger to him may have become during the difficulty or conflict, the plea of self defense cannot be invoked.

6. *Criminal law—Provocation and danger not sufficient to reduce murder to lower mode of crime.*—No provocation short of personal violence, nor any peril not apparent and imminent, will be sufficient to reduce the crime of murder to a lower order of homicide.

7. *Homicide—Threats to kill prisoner—Presumption of continuance of purpose, etc.*—The fact that the deceased threatened to kill the prisoner, or to do him great bodily harm, does not raise the presumption of law that the purpose continued down to the time of the killing, and that deceased was present at the time for the purpose of carrying out such threat.

8. *Indictment—Homicide—Want of provocation—Burden of proof.*—In an indictment for murder, the burden of proof is not upon the State to show that the prisoner killed the deceased without any justifiable or legal excuse or extenuating circumstances.

## *Appeal from Taney County Circuit Court.*

*John O'Day*, for Appellant, cited : Eastwood vs. People, 3 Park. Crim. Rep. pp. 25–58, and cases cited ; Watson vs. People, 4 Id. pp. 619–50 ; Wagn. Stat. 447, §§ 13, 18 ; State vs. Matthews, 20 Mo. 55 ; Coleman vs. Roberts, 1 Mo. 97 ; Fugate vs. Carter, 6 Mo. 267, 279 ; Hickey vs. Ryan, 15 Mo. 62.

*J. L. Smith, Att'y Gen'l*, for Respondent, cited: Wagn. Stat. 1081, § 2; State vs. Bleckly, 18 Mo. 428; State vs. Welch, 33 Mo. 33; State vs Cornell, 49 Mo. 282; Fanny vs. State, 6 Mo. 122; Wood vs. Hicks, 36 Mo. 326; Langsdorf vs. Field, 36 Mo. 440; State vs. Starr, 38 Mo. and cases cited; State vs. Linney, 52 Mo. 40; State vs. Underwood, 57 Mo. 40; State vs. Hayes, 23 Mo. 287; State vs. Holme, 54 Mo. 153; State vs. Ross, 29 Mo. 32; Franz vs. Hilterbrand, 45 Mo. 121; State vs. Harris, 59 Mo. 550.

HENRY, Judge, delivered the opinion of the court.

At the March term, 1874, of the Taney circuit court, defendant was indicted for the murder of Joseph Long. At an adjourned term of said court in December following, he filed his petition asking to be furnished with a copy of the indictment against him, and objecting to his arraignment until he should have been served with such copy, but it appearing to the court that he had previously been duly served and furnished with a copy of said indictment, his application was refused. The court heard testimony, and the evidence preserved in the bill of exceptions we think fully sustains the finding of the court. The cause, on defendant's application, was continued to the March term, 1875, at which he filed two several pleas in abatement; the first, alleging, substantially, that Joseph Glenn, one of the eighteen persons who composed the grand jury that returned the indictment against him, was not a freeholder or householder of Taney county, and that he had not been selected as a grand juror by the county court of said county, and that when said jury was sworn defendant was in Green county, in the custody of the sheriff of said county, and had no opportunity to challenge said juror, or the array.

The second plea was, in substance, that the record failed to show that the county court of Taney county selected the grand jurors, or either of them, and alleged that five of the eighteen were not selected by said court, and five others selected were not sworn on the jury, or discharged by the court.

24—VOL. LXIV.

There was a demurrer to each of these pleas, sustained by the court, and it is sufficient on that subject to say, that all the questions raised by the demurrers are settled by the cases of the State vs. Welch (33 Mo. 33); State vs. Blakey (18 Mo. 428), and State vs. Connell (49 Mo. 282), which fully sustain the action of the court.

There was then a trial of the cause, which resulted in a conviction of defendant of manslaughter in the second degree; and his punishment was assessed at three years' imprisonment in the penitentiary.

Motions for a new trial and in arrest of judgment were overruled, and defendant has prosecuted his appeal to this court.

The record is voluminous and portions of it are several times unnecessarily repeated, and there is a considerable portion of it that might have been entirely omitted, without prejudice to either party.

The evidence was somewhat contradictory, but was to the effect that defendant was engaged to be married to Miss Maddershott, who had lived in the family of deceased; that deceased was opposed to the match, and had threatened defendant's life if he married the young lady; that the 31st day of December, 1873, was appointed for the marriage, and on the evening of that day, at the residence of Jasper J. Brown, where the ceremony was to take place, there were several persons besides said Jasper Brown, uncle of defendant, defendant's mother, Miss Maddershott, and defendant; that deceased came to the house, and without any ceremony walked in, when he and defendant immediately commenced quarreling. The "lie!" and "d—d lie!" passed between them, and Jasper Brown ordered them both out of the house, and succeeded in getting them out. Deceased then started to go home, and as he walked towards the gate opening out of Jasper Brown's yard, the quarrel was renewed, and about the time deceased reached the gate defendant called him " a d—d liar." He then called defendant " a d—d liar " and turned and approached defendant, and when within a few feet of him, defendant drew a pistol and shot him.

There was testimony to the effect, that deceased was in the habit of carrying a dirk knife, but no weapon was found upon his person, and the evidence is conclusive, that when killed he was unarmed, except with a barlow knife unopened in his pocket.

After he had killed deceased, defendant went into the kitchen and Miss Maddershott asked him why he had killed Long, and, according to one witness, he replied that " no man could call me [him] a d—d liar and live." Miss Maddershott testified that his reply to her inquiry was " no man shall call me a d—d liar, and come rushing on me with a knife, as Long did." There was conflicting testimony as to the manner in which Long approached defendant from the gate. Some of the witnesses think he had his right hand raised, others are positive he had not. Some testified that defendant renewed the quarrel in the yard, others that he did not. The defense offered to prove by Mrs. Malinda Brown, mother of defendant, that immediately after the shooting, while defendant was present, and Long was lying where he had fallen, a little girl nine years of age, then and there exclaimed that "Mr. Long had a knife in his hand." The State objected and the court sustained the objection, and in this it is contended that the court erred.

We think otherwise. It was no part of the *res gestœ*. It was after Long was killed. If the exclamation had been made while Long was approaching, and before the fatal shot was fired, it would not perhaps have been hearsay, but a circumstance to be considered by the jury in determining whether defendant was acting under an apprehension that deceased was about to assail him with a deadly weapon. After the fight was over the exclamation could not be a part of the *res gestæ*, and the child could have testified as to what she saw. The court did not err in excluding the testimony.

One of the grounds relied upon in the motion for a new trial was misconduct of the jury in visiting and viewing the ground where the fight occurred, in the absence of defendant, and without his knowledge or consent, and without leave of the court. Affidavits were read in support of this motion. The facts proven by those affidavits are, that the jury during the trial of the cause

boarded at the house of J. J. Brown; that they were seen on and looking at the ground where Long was killed, but witnesses could not state that they were looking at the ground with a view of understanding how the killing was done, nor was it shown that they said anything about it, or that they conversed among themselves in regard to the ground.

The case of Martin Eastwood vs. People, (3 Park. Crim. Rep. 215,) is relied upon as an authority for the position that such conduct on the part of the jury entitled defendant to a new trial. In that case, the jury were permitted by the officer in charge of them to separate and converse with persons in the street. After the testimony was closed, before the case was summed up, six or eight of the jurors went and examined the ground where the blow which killed the deceased was given, about two miles from the court house. They went to the residence of one Hansford, and Hobbie—one of the jurors—opened the gate, stepped into the yard and placed himself upon the spot where Hansford's daughter had testified, on the trial, that she stood when she saw the defendant strike the deceased ; and then turning his head and looking toward the place where the deceased fell, Hobbie remarked that " Miss Hansford had a good view from that point, and could see all that occurred." The mere recital of the facts in that case, is sufficient to show the striking difference between that and the case at bar.

The juror, Hoppie, testified to his associates, as to a material fact. Standing where Miss Hansford swore she stood, he said to the others, "Miss Hansford had a good view from this point and could see all that occurred." No court could for a moment hesitate to set aside a verdict on such a state of facts, in a criminal case ; but in the case at bar there is not the slightest evidence of misconduct on the part of the jury. If, on such grounds as are here relied upon, a verdict must be set aside, then, when the offense is charged to have been committed at a county seat, generally a small village, over the whole extent of which one has a view from the court house window, and in which not unfrequently, the crimes for which persons are prosecuted are committed, the jury would have to be consigned to a dungeon to consider of their

verdict, lest they might accidentally see some locality mentioned in the testimony. The place where the killing occurred in this case was not in doubt. There was no conflict of evidence on that subject, no question whether any witness who testified was in a position to see what he related, and no possibility that defendant could have been prejudiced by the conduct of the jury.

The jury were boarding with defendant's uncle, and it is to be supposed that the inmates of that house were not unfriendly to the accused, or that that house was much frequented by his enemies.

His uncle was a witness, called by defendant, and we take it not unfriendly to him. To set aside a verdict on such grounds as are here presented would be trifling with justice.

The court, for the State, gave eight instructions. The first one defined murder in the first degree ; the second, murder in the second degree. The third defined the meaning of the words " wilfully," " deliberately," " premeditatedly," and " malice."

These instructions were substantially such as have been repeatedly held good by this court.

The fourth defined manslaughter in the second degree, and is faultless. The fifth told the jury that if they found from the evidence that defendant and Joseph Long had a difficulty, which resulted in the death of said Long, and that defendant commenced, or brought on the difficulty, by any wilful or unlawful act of his, or that defendant, voluntarily, and of his own free will and inclination, entered into the difficulty, then there was no self defense in the case, and the jury should not acquit on that ground, however high the passion of defendant may have become, or however imminent, or near, the danger to defendant may have been during said difficulty or conflict.

The sixth instruction declared that no word of reproach or abuse, however grievous, nor any indecent or provoking act however calculated to excite indignation or anger, are sufficient to reduce the crime of killing to a lower degree than murder, and that the provocation must consist of personal violence, or that the danger of such must be apparent and imminent.

The eighth was the usual instruction in regard to reasonable doubt and is not complained of.

The seventh instruction was faulty and is as follows : "The court instructs the jury that they are the sole judges of the credibility of the witnesses, and if they believe that any witness has testified falsely in relation to any material matter, they are at liberty to disregard all or any part of such witness' testimony."

It is not a correct statement of the law. A jury is not warranted in disregarding the testimony of a witness who has testified falsely unintentionally. The seventh instruction should have been so qualified. But has the defendant been injured by it? In examining the whole record, it is somewhat difficult to perceive any ground for giving any instruction on that subject.

Witnesses differed, it is true, in their accounts of the difficulty, but the differences were only such as are frequently observed in the account given by eye witnesses of rencounters which are of a character to excite and alarm spectators. That they do not agree in their testimony in relation to it, is not often to be attributed to mendacity, but to the fact that one witnessed it from one point and another from a different point, that some were more excited than others, and none perhaps so cool as to tell all they saw, just as they saw it.

The testimony of the witnesses for the defense, was not such as in our judgment to authorize an instruction on that subject ; but the jury, if governed by it, would have found as much in the evidence for the State to which it was applicable as in that for the defense. We think it was a harmless instruction in this case, while there are cases in which it would be fatal to a verdict.

The fifth and sixth instructions correctly stated the law. (State vs. Starr, 38 Mo. 270 ; State vs. Holme, 54 Mo. 153 ; State vs. Underwood, 57 Mo. 40.)

The defendant asked twenty-one instructions, eighteen of which were given. The three refused instructions were as follows, substantially : Number fourteen asked the court to declare that "if defendant shot and killed Long in a heat of passion, produced by an assault Long was making on him by advancing on de-

Stale v. Brown.

fendant to beat him, and that in the excitement and fear, after he had retreated to the house, he shot and killed Long to prevent Long from inflicting personal injury on him, there not being reasonable cause for defendant to apprehend that Long intended to kill him, or do him great bodily harm, then defendant would be guilty of manslaughter in the fourth degree. Manslaughter in the fourth degree is the involuntary killing of another by weapon or by means neither cruel nor unusual, in the heat of passion, in any cases other than justifiable homicide." (Wagn. Stat. 447, § 17.) The substance of the refused instruction is, that, if defendant, in a passion, intentionally killed the deceased, because deceased was advancing on him, although defendant had no reason to apprehend that Long intended to kill him, or do him great bodily harm, it was an involuntary killing. Stripped of its verbage, its absurdity will at once be seen.

The seventeenth instruction, asked by defendant and refused, asked the court to declare to the jury, that when it was once shown that Long threatened to kill defendant, or to do him great bodily harm, the presumption of law is that such intention of Long continued down to, and including the time of, the killing, and that Long was present at J. J. Brown's for the purpose of carrying into execution such previous threats. There is no such presumption of law. The jury were to determine from what occurred between the parties, whether deceased was there for the purpose of putting his threats into execution or not.

The twentieth instruction asked by defendant and refused was, " that the burden of proof was on the State to prove a case against defendant, not only that he killed Long, but that he did so without any justifiable or legal excuse, or extenuating circumstances." The court did not err in refusing that instruction. (State vs. Hays, 23 Mo. 287 ; State vs. Underwood, 57 Mo. 40.)

The eight instructions given for the State, and the eighteen given at the instance of defendant, presented the case to the jury more favorably for him than defendant had any right to ask. The jury treated him with remarkable leniency, and he has no reason to complain either of the action of the court or the jury.

Judgment affirmed, all the judges concur, except Judge Sherwood, absent.