STATE v. JOE BISWELL, Appellant.—No. 38551.—179 S. W. (2d) 61.

Division Two, April 3, 1944.

*Luman Spry* and *Jack H. Denny* for appellant.

700

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

702

LEEDY, J.—Defendant, Joe Biswell, was charged with murder in the first degree in having shot and killed Leo Linneman. He was convicted of murder in the second degree, and sentenced

in accordance with the verdict to 40 years' imprisonment, and he appeals.

The deceased, Linneman, and defendant lived on adjoining farms in the vicinity of Armstrong in Howard County. They had so resided from the time, 19 years before the homicide, defendant moved to his said farm. During the intervening years the two men had not always been on good terms. On the contrary, it appears that they had had numerous difficulties and misunderstandings as will hereinafter more fully appear. The homicide occurred on Monday, June 22, 1942, in the barn lot of the Linneman (deceased's) farm. The defendant, admitting the killing, defended on the ground of insanity, and also as having been done in self-defense. Defendant was 47 years of age; Linneman several years older. It appears that defendant is quite deaf, his evidence tending to show an impairment in his hearing of 87%.

There is no dispute as to the fact that in the early evening of the day in question, the deceased and his wife, Susie, were engaged in milking their cows—he milking one, and she the other—when the fatal difficulty arose. According to the state's version of the killing, as testified to by Susie, the following occurred: "He [the deceased] was sitting on the milk stool with his head up against the cow milking his cow, and I was on one knee milking the other, and not knowing anyone was present. Fern [Biswell, defendant's wife] came up and hollered to Mr. Linneman and he said 'Yes.' And then Joe Biswell hollered to him and asked him if he was still mad and he said 'Hell, yes.' And then she hollered to Joe Biswell and said to him that he had said 'Hell, yes.' And Joe had his gun under his arm and he fired three shots into the back of Leo Linneman. And my husband tried to get up from the milk stool but he never could get up at all—he got up but he got up in a crouch and faced me and then turned back to the corner of the barn and went there in a crouch and fell dead at the corner of the barn. And while he was going to the corner of the barn Joe Biswell fired three more shots—anyway seven shots were fired; and he said, 'That is what I came for.' And he told Fern Biswell to call the law. And when she had gone Joe Biswell walked up to Leo and shot Leo in the head and said, 'That is what I have been wanting to do for a long time.' Then he backed up a couple of steps and pointed at me and said he was going to lay me by the side of him, and I hit at the gun with a stick —I hit at him or the gun one—I hit at him—and I walked up by the side of the barn—I thought I would be the next one; and he reached down and took the hat off of Leo and pulled the pipe out of his mouth and threw the pipe over in the potato patch."

The witness further testified she tried to get away—"jumped the gate and two fences"—but defendant brought her back and detained her until "the law came." One of the officers who responded to Mrs.

704

Biswell's call testified that, en route to the county seat following the shooting, defendant made the statement he had often wondered how a man would feel after having killed another man, but that he felt no different than he would if he had killed a rabbit or a dog. As a part of the same conversation, defendant's wife said she tried to keep her husband from going down to Linneman's, "but that it was the first time that Joe ever was so mad that she could not do anything with him."

The testimony on the part of defendant tended to show the following: That he and deceased had quarreled from time to time ever since they had lived in the neighborhood, the first of such quarrels having occurred the very year defendant moved on his farm. It concerned the acreage of defendant's wheat crop. Subsequently—at times not definitely shown by the record—they quarreled over a line fence, and had trouble growing out of deceased's ducks being on defendant's pond; also over deceased going through defendant's farm, and over deceased's livestock getting on defendant's premises and destroying his property. During the course of some of these disturbances, the deceased cursed and threatened defendant and members of his family. Defendant's wife testified that on the morning after she and defendant were married (about 16 years prior to the killing), and while they were getting up and were quite scantily clad, they discovered deceased about their bedroom, and that he stood in the door and laughed until ordered by defendant to leave. Defendant's wife also testified that in the latter part of March or the first of April, 1942, the deceased made an indecent proposal to her, which was communicated to defendant. Notwithstanding the foregoing it appears that the relations between the two families were not entirely unfriendly because it was admitted by defendant's wife that on Friday preceding the homicide she had received from the wife of deceased some articles from the latter's garden, which she, with defendant's knowledge, put on the table and used. Moreover, the undisputed fact is that the fatal difficulty arose out of the circumstance that a few days prior to the homicide, deceased had borrowed a male hog from defendant for breeding purposes. The deceased returned said hog on Saturday, June 20th, at which time he was angry, and complained about the hog's inability or unwillingness to perform as a breeding animal, saying it "wasn't a damned bit account, and didn't know what a sow was made for." We infer that on that occasion the conversation was between defendant's sons and the deceased, this because of the reason assigned by defendant for going down to the Linneman farm later that day, his testimony in that connection being as follows: "Tell the jury what that trouble was. A. Mr. Linneman brought that male hog home and was mad about it and I thought I would go and see what he was so mad about and I told my wife that I would take Anthony down there to see what was

the matter, and so after supper we went and I asked Mr. Linneman what he was so mad about and he picked up a cow-bell and said, 'You God-damned son-of-a-bitch, I will knock your damned head off,' and he kept talking at the top of his voice and waving the cow-bell around and he pulled out a knife and said, 'You God-damned son-of-a-bitch, I am going to cut your damned guts out,' and I never said a word to him, only to ask two or three times what he was so mad about. I was shocked; I didn't know what was the matter with him. He didn't look like a human but more like a devil to me, and he hollowed and cursed me and Anthony got scared and got close to me and we started home, and Susie came from behind the barn—that was Mrs. Linneman, I mean . . . '' The defendant testified that he thereupon returned to his home, and then ''went over to Armstrong to see about having him arrested.'' At Armstrong he learned it would be necessary to go to Fayette, the county seat, to get a warrant, and as there was ''a big cloud coming up, we went on and never did get to have him arrested.''

With reference to the fatal shooting, the defendant testified as follows: ''Q. When you got down there to Leo Linneman's lot, whom did you see? A. I seen Mr. Linneman and Mrs. Linneman.

''Q. What were they doing? A. Milking.

''Q. Did you, or did you not, ask Mr. Linneman any questions?

''A. Just one question.

''Q. What did you ask him? A. I asked him if he was as mad as he was.

''Q. Tell the jury what happened after that?

''A. He said, 'Yes, you God damned son of a bitch, I am going to kill you, right now,' and he jumped up and grabbed his milk stool and threw at us and my wife jumped back and it went between us, and it came near hitting me on the head, and he grabbed a stick and I started back and stumbled and that is all I remember about it.

''Q. Do you remember seeing him throw his stool at you?

''A. Yes, sir.

''Q. Do you remember seeing him manipulating a club of any kind?

''A. A stick.

''Q. What size was this stick? A. Oh, about that big around. (Indicating.)

''Q. Ask him if it were about the size of a broomstick?

''A. Yes, but I didn't have time to judge the size of it. It looked pretty big to me.

''Q. Did your wife tell you what Mr. Linneman said at that time?

''A. Yes, sir; she didn't get to tell it all.

''Q. Do you remember shooting Leo Linneman? A. No, sir.

''Q. Did you find out afterward you had shot Leo Linneman?

''A. Yes, sir.''

Concerning the circumstances under which he was present at the time and place of the killing, defendant testified, on cross-examination, as follows: "Q. Why did you take this gun down there with you, Monday? A. I thought about how he had threatened my life every time I had a fuss,—how he cursed and threatened the lives of every. one of my little boys, and I knew he was a bad, dangerous man. . . . Q. If you were afraid of this man, why did you go down there on Monday? A. I went down there to make peace with him, —I didn't want him to be mad at me. It was time to thresh wheat. He does the wheat threshing for us. . . . Q. Did you take your .32 automatic down there with you to make peace? A. Yes."

The remaining eye-witness, defendant's wife, Fern, testified as follows: "It rained Saturday night and we could not get the warrant served and he would not have anything done like that on a Sunday and on Monday I said, 'Aren't you going to have that warrant served on Mr. Linneman?' He said, 'No, I have changed my mind. He has to thresh wheat and if I had him arrested he would be an enemy for life. I am going down to see if I can't get him to make up with me.'

"Q. Did you advise him to go or stay away?

"A. I told him not to go.

"Q. Did you know about his going down there with a gun?

"A. I knew he took a gun, . . .

"Q. Tell what happened down there in the lot.

"A. Well, Mr. and Mrs. Linneman were milking cows and Mr. Linneman was sitting on the stool and Joe said, 'Are you still mad?' 'You are God damned right, I am mad, you son-of-a-bitch,—I am going to kill you,' and he throwed the stool and my husband and I had to get apart to keep the stool from striking us. Mr. Linneman came at my husband with a cow stick and my husband fell down in a crouch and my husband started to shoot as he raised up from the crouch, and kept shooting.

"Q. How many shots did he make, at first?

"A. I don't know, but I imagine two or three.

"Q. Were you confused, to some extent?

"A. Very confused, and nervous.

"Q. After the first two or three shots were fired, what happened? A. Mr. Linneman started to fall, this way, and he fell on his right side. (Demonstrating)

"Q. And what happened after that? A. Well, Mrs. Linneman came up, screaming and hollowing.

"Q. What did Joe do next, if anything, after he had fired the first five shots? A. Well, I was no nervous I don't know what he did, hardly. . . .

"Q. Did you see Joe Biswell shoot Leo Linneman through the head? A. Yes, sir. I did everything I could to keep him from it

and tried to stop him, but I could not do anything; and Mrs. Linneman said, 'God damn you, I am going to kill you,—I am going to kill you,' and struck at him a couple of times.

"Q. Tell the jury what else you did. A. Well, I sent for the law after that."

Mrs. Linneman denied that her husband picked up the milk stool or the cow stick—"because he wasn't able to." Concerning the quarrel over the hog on Saturday, she testified defendant came to their place, and asked her husband "What in the God dam hell he was sore about?"; that her husband replied he had cause to be; that he told defendant he was supposed to furnish him with a good male hog, and he [defendant] knew the hog was no good, and defendant said he knew it; that defendant "made two grabs at him, and Leo dodged him, and picked up a cow bell, and told him not to come any closer."

Defendant introduced numerous witnesses who testified to his good reputation for being a peaceable, law-abiding citizen, and there was also evidence, pro and con, touching the defense of insanity. The case was submitted on murder in the first and second degrees, with instructions covering the subjects of self-defense and insanity, among others.

■■ The first assignment complains of the competency of certain members of the panel of thirty from which the trial jury was selected. Upon their voir dire examination, eight persons answered that they had "read the testimony given at the inquest as recorded in the Armstrong Herald." For such reason, each juror was, without further interrogation, then and there challenged. For present purposes, it will be assumed that the testimony appearing in the local newspaper was, in fact, an accurate reproduction of that given before the Coroner's jury, and thus reach the merits of the contention, although it is questionable whether the record warrants such assumption. If said persons, or any of them, had formed or expressed an opinion as to the guilt or innocence of defendant, based on said testimony, they would be disqualified to act as jurors, and the doctrine of such cases as State v. Foley, 144 Mo. 600, 46 S. W. 733, would apply. But there was nothing before the court indicating they had formed or expressed any opinion. They were not interrogated in that regard. In this situation, we think defendant is in no position to complain, particularly in the light of the record which shows that each of said persons stated affirmatively, in answer to a question propounded by the court, that they could "go in the jury box . . . and after hearing the evidence and instructions of the court, render a fair and impartial verdict in this case without being influenced by what you read in that newspaper."

■ The next assignment is that there is no substantial evidence to support the verdict. The defendant expressly concedes that the

testimony of deceased's wife, if true, would support a verdict of murder in the second degree, but he contends that the physical facts demonstrate the falsity of her testimony that the defendant shot the deceased in the back while he was leaning over milking the cow. This contention proceeds on the assumption that the state is conclusively bound by an opinion expressed by a non-expert as to the point of entry and the course of the several bullets. The physician who performed the autopsy, being ill, did not testify. In his absence the state called one Kerman Ashcraft, a deputy sheriff and former sheriff of the county, who was present throughout the autopsy, and who, from notes taken at the time, prepared a diagram, introduced in evidence, which purported to show the approximate location of the six bullet wounds in deceased's body. It is true that in the course of his examination said witness expressed the opinion that said bullets (aside from the one in the head) entered from the front. It has been said that the test of "substantial evidence" as respects the right of defendant to a reversal on the ground that the verdict is not supported by evidence is whether the jury reasonably could find the issue thereon. State v. Gregory, 339 Mo. 133, 96 S. W. (2d) 47. Notwithstanding the opinion of the witness called by the state, we entertain no doubt as to the evidence being sufficient to induce belief of defendant's guilt beyond a reasonable doubt, and so overrule the contention.

■ The proposition that the verdict is excessive is answered by the fact that the punishment assessed is within the limits prescribed by the statute [Sec. 4378 R. S. '39, which fixes the penalty at not less than 10 years' imprisonment], and hence cannot be adjudged excessive. State v. Copeland, 335 Mo. 140, 71 S. W. (2d) 746; State v. Jenkins, 327 Mo. 326, 37 S. W. (2d) 433.

■ ■ This brings us to a consideration of the main question in the case; that is, whether the facts were such as to require the giving of an instruction on manslaughter. The question turns on whether there was substantial evidence of lawful provocation. In contending that such an instruction was required, the defendant relies on the testimony of himself and wife to the effect that the deceased threw the milk stool and very nearly hit them with it. "This," says defendant, "would certainly constitute sufficient provocation to reduce the crime to manslaughter." We do not agree. We shall not undertake to again review the cases. The subject is exhaustively treated and cases collated in the comparatively recent cases of State v. Bongard, 330 Mo. 805, 51 S. W. (2d) 84, and State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) 556. In the Bongard case, the following from State v. Starr, 38 Mo. 270 (characterized as "probably the leading decision on the question in Missouri") is quoted with approval: " 'Where there is lawful provocation, the law, out of indulgence to human fraility, will reduce the killing from the crime

of murder to manslaughter; but neither words of reproach, how grievous soever, nor indecent provoking actions or gestures, however much calculated to excite indignation ▮ or arouse the passions, are sufficient to free the party killing from the guilt of murder. *To have the effect to reduce the guilt of killing to the lower grade, the provocation must consist of personal violence.* . . . This rule is well established, and we imagine it would not be the part of wisdom to substitute in its place one fluctuating or less rigid, which would require the accused to be judged in each case according to the excitement incident to his natural temperament when aroused by real or fancied insult given by words alone. . . . *There must be an assault upon the person,* as where the provocation was by pulling the nose, purposely jostling the slayer aside in the highway, . . . *or other direct and actual battery.'*"

The Bongard case expressly overrules State v. Brown, 64 Mo. 367, and after quoting the foregoing from the Starr case and citing numerous other cases, proceeds to say: "But, in view of the long line of decisions cited in the preceding paragraphs, it appears to be well settled that the law of this state is not as liberal as in some jurisdictions; and that to constitute adequate provocation there must be more than opprobrious words, more, even, than a demonstration with a deadly weapon imminently threatening danger—*there must be actual violence to the person.*" (All italics the present writer's.) The opinion points out that what is said in the foregoing connection has "no reference to homicides committed on provocation in the defense of property or because of illicit sexual conduct of or with a near female relative." (as in State v. Grugin, 147 Mo. 39, 47 S. W. 1058, relied on by defendant.)

The defendant was asked on cross-examination, "Were you hit with the stick?" to which he replied, "I don't know, sir. I know I had a couple of bruises on me." The defendant argues that it appears from the foregoing "that there might have been an actual battery." We think the statement is not to be regarded as substantial evidence of an antecedent battery, particularly in the light of Mrs. Linneman's testimony, not denied by the defendant, with reference to her striking and hitting at him or the gun (which was after the killing). We conclude that under the proof adduced that there were no provocative blows—no actual violence to the person to engender heat of passion, within the rule of the foregoing cases, and that the court did not err in failing to instruct on the subject of an intentional killing in the heat of passion. Nor do we think that an instruction on the law of imperfect self-defense was called for. The state's evidence presented no self-defense issue, nor do we find any suggestion in the evidence that defendant brought on the difficulty with some unlawful purpose short of an intended felony. [State v. Painter, 329 Mo. 314, 44 S. W. (2d) 79.]

■ Complaint is made of the action of the court in refusing to admit the testimony of witness Patton "in relation to previous threats made by the deceased, difficulties between the deceased and the defendant, and did not allow any explanation of said difficulties by the witness." The court did sustain an objection to an inquiry concerning trouble between the deceased and the defendant which occurred 16 or 17 years before the homicide. However, there was no offer to prove what the witness would testify to concerning the subject of inquiry, and hence the trial court was not apprised as to the nature of proposed proof.

■ We have examined defendant's refused instructions "K," "L," and "M" (on the subject of insanity) in the light of the sole contention urged here, i. e., that it was error to refuse them because they submitted the converse of state's instruction No. 8. We find a literal and exact copy of said instruction "K" is embodied (along with other matter) in state's instruction No. 8. As to "L" and "M," it is sufficient to say that they are not to be regarded as converse instructions, and that their subject-matter was sufficiently covered by the state's said instruction No. 8, and it was, therefore, not error to refuse them.

■ ■ We think there was no error in rejecting the charred remains of a hearing device, the property of defendant's sister, who, it appears from the evidence, became insane the week before the trial. It was offered on the theory that the sister in her insane condition had burned up a valuable piece of equipment. The rejection of the exhibit was charged to be error for the reason that it would have aided in impressing on the jury the truth and sincerity of the testimony with respect to the sister's recently developed mental condition. However, it appears that the state offered to admit the sister's insanity, and so, even ■ assuming it would have been otherwise proper to admit the remains of the earphone in evidence, there is no likelihood that defendant could have been prejudiced by the court's action.

Other matters are urged but they are of such nature as to require no discussion. We have examined the record proper and find it sufficient. The judgment should be affirmed, and it is so ordered. All concur.