240 S.W.2d 671 (1951)
STATE
v.
SMITH.
No. 42285.
Supreme Court of Missouri, Division No. 1.
June 11, 1951.
*672 Geo. F. Addison, Salem, for appellant.
J. E. Taylor, Atty. Gen., Hugh P. Williamson, Asst. Atty. Gen., for respondent.
HOLLINGSWORTH, Judge.
Defendant was convicted of murder in the second degree and sentenced to imprisonment in the State Penitentiary for a term of ten years for shooting Thomas Martin to death with a shotgun. He has appealed to this court, assigning as error the failure of the trial court to instruct the jury on the law of manslaughter, the admission of certain photographs into evidence, and the alleged intentional exclusion of women from the jury panel.
The slaying of Thomas Martin by defendant occurred at the Martin home on a farm located on Highway No. 19, near Salem, in Dent County, Missouri, on April 25, 1949. Thomas Martin was the stepfather of defendant, having married his mother in 1924. Defendant had lived in the home with his stepfather and mother for more than two years prior to the shooting.
The marriage between Mr. and Mrs. Martin had not been an entirely pleasant one. They had separated several times. Likewise, the relations between defendant and his stepfather had been strained. There was evidence that Martin had complained to third persons that defendant drank too much and did not perform a fair share of the farm work. There was also evidence that in the early spring or late winter prior to the shooting defendant had said to third persons "that he (Martin) could stay there (on the farm) until oats-sowing time and then he was going to get rid of him."
Around 6:30 in the evening of April 25, 1949, defendant came to the store of Bill Cook at Gano, one-half mile from the Martin home, told Cook he had killed Tom Martin and asked Cook to call the sheriff, which he did. Shortly thereafter State Patrolman Bair and Sheriff Nash arrived at the store. Defendant came to their car and told them he had shot Martin. They took defendant into their car and went to the Martin home, where they found the dead body of Martin lying in the kitchen. The prosecuting attorney arrived soon thereafter and took a series of photographs of the interior of the home, in two of which (State's Exhibits "A" and "B") Martin's body was shown. Following testimony tending to show that these photographs were accurate representations of the scene and that no changes had taken place since the shooting, they were admitted in evidence.
The Martin home is a four-room frame house, consisting of a living room, kitchen and two bedrooms. On the front thereof is a screened porch facing the highway. An entrance from the porch leads into the living room. Across the living room is a door leading into the kitchen. As one enters the living room from the front porch, there is an entrance immediately to the left into a bedroom.
Martin's body, partly under a dining table in the kitchen, was lying on its right side. The front of his body and his face were toward the entrance from the living room. Between the entrance and his body was a single-barrel, 16-gauge shotgun, which lay with the stock toward Martin and the barrel pointed toward the living room entrance. This shotgun had a recently exploded shell in it. There was a gash-like wound on Martin's inner right arm and wounds in his lower right abdomen and near the left armpit and left chest. His clothing was blood-soaked in these areas, but the wounds are not visible in the photographs.
Testifying in behalf of the State, Patrolman Bair related in detail an oral statement there made by defendant to him and Sheriff Nash as to the circumstances under which he claimed to have killed Martin. This statement, as related by Bair, is not materially at variance with defendant's testimony given at the trial and hereinafter set forth. It will suffice, therefore, *673 to here give its general import. It was that defendant had killed Martin by firing two shots into his body after Martin had fired one shot at and missed him. Defendant there stated to Bair and Nash that the 16-gauge shotgun found by the body of Martin was the gun with which Martin had shot at him and pointed out to them a shot pattern on the living room wall and jamb of the bedroom door as the place where he said the shot fired by Martin had entered. A three-shot, bolt action, 20-gauge shotgun was found in the bedroom. Defendant said it was the gun with which he fired the two shots into Martin's body. Bair noticed defendant's clothing was clean and asked defendant if he wore that clothing at the time of the shooting. Defendant said he did. On the following day, Bair found a man's shirt and trousers hung to dry in a woodshed on the premises. Defendant admitted they belonged to him. The trouser legs had circular spots on them about a quarter of an inch in diameter that resembled blood stains.
Defendant pleaded self-defense. He denied having made any statement to the effect that he was "going to let Martin stay until oats-sowing time and then get rid of him."
His further testimony was: As his mother and Martin sat on the porch defendant was watering flowers in the yard. Martin called out to him, "Leslie, you are going to get you another place to stay", to which he replied, "All right." He stepped up on the porch step and said, "Dad, set down and cut out this argument. What is it all about?" Martin then ran through the living room into the kitchen and defendant stepped inside the living room and watched him. Martin got his gun from behind a cabinet, came out and fired at him. As Martin fired, defendant jumped into the bedroom and the shot fired by Martin missed him but would have hit him if he had stood where he was. Defendant got his shotgun from behind the bedroom door, came out of the bedroom and looked toward the kitchen. Martin was standing there with his gun in a firing position. Defendant fired one shot at Martin and Martin hesitated and then lunged for defendant with his hand to grab defendant's gun. Defendant stepped further into the room and fired again. The two shots were fired in rapid succession, as fast as he could eject the shell and reload.
He then testified:
"Q. Now, Les, at the time that you fired those shots did you feel that your life was in danger, were you afraid that your life was in danger? A. Sure.
"Q. Did you fire those shots in an effort to save your life? A. Sure did."
Defendant further testified that following the shooting he went back into the bedroom, ejected the exploded shell from his gun, reloaded it, placed it on the bed, walked back into the living room and saw Martin lying there. He then went to look for his mother, found her, took her to the porch and went to the store at Gano to call the officers.
Mrs. Martin testified: On this evening Mr. Martin called her to the porch and went to quarreling with her. Leslie had then gone to the mailbox but soon returned and began to water the flowers. Mr. Martin was cursing her. He wanted his two sons to move in with them and she wouldn't agree to it. Martin said to her, "By God, if you don't like it, you can get your God damned self away." He then stepped to the edge of the porch and told Leslie "he would have to get him another home." Leslie came to the porch door and said, "Dad, set down and be quiet." Martin then went for his gun. She peeped around the doorfacing and watched him. He reached and got his gun and ran back, pointed it toward Leslie and shot, and Leslie jumped through the bedroom door. She ran and hid in an outdoor toilet. She heard two more shots. Leslie thereafter found her, took her to the front porch, told her he had killed Martin and that he had to do it. He then went to call the officers and she sat on the porch until they came.
Defendant contends the court erred in failing to give an instruction on manslaughter for the reasons that: (a) the killing was the result of and occurred in the course of a sudden quarrel or combat and (b) the evidence in this case tends to *674 show that the second shot fired by appellant may have been the use of excessive force repelling the attack by deceased.
No instruction on manslaughter was offered by defendant and the record does not show a request was made that one be given. However, if the evidence presented such an issue, then the court was required to instruct on it. R.S.Mo.1949, § 546.070; State v. Littlejohn, 356 Mo. 1052, 204 S.W.2d 750, 752.
The conceded fact that defendant intentionally killed Martin with a shotgun and there was no witness to the occurrence, in and of itself, raises a presumption of murder in the second degree. State v. Battles, 357 Mo. 1223, 212 S.W.2d 753; State v. Lawson, 360 Mo. 95, 227 S.W.2d 642. Malice aforethought is the essence of murder in the second degree. The existence or non-existence of such malice determines whether the homicide is second degree murder or manslaughter. State v. Lawson, supra.
Absence of malice may arise when the accused acts upon lawful provocation. However, even if we assume that the quarreling between Martin and defendant's mother and the words exchanged between him and Martin constituted a sudden quarrel, yet it is clearly the law in this State that no amount of quarreling, or use of opprobrious or insulting epithets, absent physical violence, constitute lawful provocation or warrant the reduction of an intentional and otherwise unjustifiable homicide from murder to manslaughter. State v. Creighton, 330 Mo. 1176, 52 S.W.2d 556; State v. Bongard, 330 Mo. 805, 51 S.W.2d 84; State v. Biswell, 352 Mo. 698, 179 S.W. 2d 61, 65; State v. Robinson, 353 Mo. 934, 185 S.W.2d 636, 639; State v. Littlejohn, 356 Mo. 1052, 204 S.W.2d 750.
There was no evidence of sudden combat between defendant and Martin other than their sudden intentional shooting at each other from close range. From this fact alone, it must be presumed each intended to kill the other. State v. Dollar-hide, 333 Mo. 1087, 1089, 63 S.W.2d 998; State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734, 737. Combat such as this does not reduce the homicide to manslaughter. "If accused or both accused and deceased entered the combat with the intention of killing, the heat of passion * * * will not reduce the homicide to manslaughter." 40 C.J.S., Homicide, § 48, pages 911, 913. In order to reduce the killing from murder to manslaughter defendant must have entered the conflict without intending to commit a felony. In this case he either shot with felonious intent or he shot in self-defense. State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38, 41, and cases therein cited. Furthermore, even though deceased shot at defendant (and missed his aim), yet that fact does not constitute lawful provocation. "It may seem illogical to say the insulting but comparatively harmless jostling of a person on the highway, or a mere tweaking of the nose, may be sufficient to constitute lawful provocation, whereas a hostile demonstration with a deadly weapon threatening imminent danger to life will not, though accompanied by vile and insulting language. But the law cannot have a rule exactly accommodating itself to the varied dispositions of people and altogether putting a premium on turbulent tendencies. A killing even in heat of passion is not justifiable. For the proper administration of justice some absolute standard of conduct is required. Trial judges must not be left to grope in the dark; nor should the law be made to depend on the views of the individual judge. Though the provocation fall short of being adequate or lawful, within the foregoing rule, it will still often be what is denominated `just,' and reduce the homicide to second degree murder. * * * Where the defendant believes, and has reasonable ground for belief, that an impending assault imminently threatens his life or great bodily harm, he can act in self-defense and be completely exculpated, though there be no battery. Juries may be depended upon to deal with the particular facts as justice demands. It is hard to improve on the common law rule." State v. Bongard, 330 Mo. 805, 51 S.W.2d 84, 89. See also State v. Shuster, Mo.Sup., 183 S.W.296, 298; State v. Biswell, 352 Mo. 698, 179 S.W.2d 61; State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38.
*675 Defendant further contends that defendant may have used more force than necessary to repel deceased's attack upon him. He says the evidence tended to show that the second shot fired by appellant may have been the use of excessive force. Even if so, the shot was intentionally fired for the purpose of killing deceased. Defendant testified positively that both shots were fired because he thought his life was in danger and that both were fired in an effort to save his life. As shown by the cases above cited, defendant was either guilty of murder in the second degree or he should have been acquitted on the ground of self-defense.
Defendant next complains that two photographs, State's Exhibits "A" and "B", were admitted into evidence without the proper foundation having been laid and that they were not relevant. As heretofore stated, there was testimony showing that they were accurate pictures of the scene as it existed immediately following the shooting. They showed the dead body of Martin and established his death from violence, its position on the floor and its location in the kitchen just beyond the entrance into the living room. They showed Martin's shotgun with its stock near his body and the barrel pointing toward the living room entrance. They, together with two other photographs, showed the relative locations of the front porch, the bedroom, the living room and kitchen, the shot pattern near the bedroom entrance, and made clear and readily understandable the testimony of the State's witness, Bair; far more so, indeed, than would have been the case had they not been in evidence. They were clearly admissible. State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185; State v. McGee, 336 Mo. 1082, 83 S. W.2d 98, 106; State v. Lawson, Mo.Sup., 227 S.W.2d 642, 644.
Defendant finally contends the trial court erred in refusing to set aside the verdict and grant a new trial upon showing made that both the regular panel and extra jurors selected by the sheriff were illegally drawn and selected due to the intentional and systematic exclusion of women. This question was first raised in the motion for new trial. It is not contended that defendant was actually prejudiced by the absence of women from the jury panel.
Attached to the motion for new trial were affidavits of the circuit clerk and Mr. Addison, counsel for defendant. In the circuit clerk's affidavit, he stated: "The fact that some women have failed to serve and that some do not want to serve and that this has tended to `mess up' the jury list, has been repeatedly discussed at these meetings, and names of few women, if any, are now included among those names placed in the envelopes." In Mr. Addison's affidavit, he stated, in substance, that from personal observation he knew that in each instance where additional jurors were summoned during the term at which this case was tried only men were summoned and that ever since women were admitted to jury service he had noticed that the sheriff, in summoning special jurors, had summoned only one woman.
Defendant's contention cannot be sustained. The affidavit of Mr. Addison reveals that he had knowledge of the practice in vogue in Dent County with relation to service of women on juries. "It is * * * well settled both by statute and decision in this State that an objection or challenge to the array of petit jurors must be made before the jury is sworn where the grounds of objection are known or means of their ascertainment available." Varble v. Whitecotton, 354 Mo. 570, 190 S.W.2d 244, 245. See also State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734, 737, 738.
Moreover, in State v. Taylor, supra, we held: "There is nothing in the constitution or statutes which requires an accused, man or woman, to be tried by a jury composed of both men and women, or now of men only, or of woman only, or of any definite proportion of the two sexes. While an accused has the right to a jury fairly selected, still his right is not to pick out the jury, but to reject any who are unqualified or prejudiced. He is only guaranteed an impartial jury, fairly selected. We can not say the jury in this case was unfairly selected merely because women *676 may not have been included among those summoned as prospective jurors. If such was the fact the accused was in nowise prejudiced and his constitutional rights to due process and equal protection of the laws were not infringed."
The judgment of the trial court is affirmed.
All concur.