# THE STATE v. JAMES SCHRUM, Appellant.

### Division Two, February 17, 1914.

1. **BILL OF EXCEPTIONS: Original: Order of Supreme Court: Death Penalty.** Although the State briefed this appeal (that of a defendant sentenced to death) on the point that no bill of exceptions was properly filed, yet, the original bill of exceptions and· a certified copy of the record proper having been filed pursuant to an order of the Supreme Court, the court, on inspection of them, feels justified in examining, and does examine, the proceedings on the trial as shown by the bill of exceptions.

2. **HOMICIDE: Provocation: Cooling Time.** Provocation given to defendant by the murdered man two days and a night before the killing was too remote to reduce the homicide from murder of the first degree to murder in the second degree.

3. ————**: Evidence: Res Gestae: Objections.** Where defendant came upon two men together and shot first one and then the other to death, testimony as to his shooting the second is admissible, as a part of the *res gestae*, upon his trial for murdering the first; but even if this were not so its introduction must be objected to and an exception saved before the Supreme Court can consider the matter on appeal.

4. ————**: Instructions: Good Character.** Where the court in a murder trial has given a proper instruction on good character, defendant cannot complain because his own instruction on that point was refused.

5. **MOTION FOR NEW TRIAL: Bill of Exceptions.** An allegation in the motion for a new trial that the State's counsel in his argument called the defendant a murderer and an assassin does not prove itself, and unless the bill of exceptions states that such alleged misconduct occurred the Supreme Court must presume that it did not occur.

6. ————**: Two Informations: Separate Trials: Objections: Jeopardy.** Defendant came upon two men ·together and killed both of them. Two informations were filed against him— one for each killing. After he had been tried and convicted upon· ·one of them, the second case was called during the same· term and the jury sworn and impaneled, when defendant's counsel objected to a trial at that time on the ground that two informations were pending against the defendant and he had already been tried on one of them, whereas both should'

have been tried at once. The objection was overruled and the trial proceeded to defendant's conviction and sentence to death. *Held*, that the objection cannot benefit the defendant on appeal. Counsel did not claim that defendant's having been tried on one information would prejudice him on the second trial, and if they were of the opinion that he could not be fairly tried at that time, application for delay or a continuance should have been made before the jury was sworn and defendant put in jeopardy.

*Felix O. Paston* and *F. M. Carter* for appellant.

*John T. Barker*, Attorney-General, and *W. T. Rutherford*, Assistant Attorney-General, for the State.

(1) A mass of papers purporting to be a bill of exceptions but not signed by the judge cannot be considered as such by the court on appeal. State v. Griffin, 249 Mo. 624; State v. Watts, 248 Mo. 494; State v. Brown, 216 Mo. 377; State v. Collins, 196 Mo. 87; State v. Brown, 164 Mo. 726; Reno v. Fitzjarrell, 163 Mo. 411; Roberts v. Jones, 148 Mo. 368. (2) As the record in this case does not show when the motions in arrest of judgment and for a new trial were filed, they cannot be considered on appeal. Young v. Downey, 150 Mo. 323; St. Louis v. Boyce, 130 Mo. 572; Pound v. Cassity, 91 Mo. App. 425-431; Bradbury v. Kerns, 115 Mo. App. 100; Stephens v. Railway, 157 Mo. App. 670; State v. Brown, 206 Mo. 506; Brown v. Daniel, 198 Mo. 317. (3) As the record proper does not affirmatively show that a motion for a new trial was filed, this court cannot consider the errors assigned even if they are preserved in a duly authenticated bill of exceptions. Klatz v. Pertect, 101 Mo. 216; Railroad v. Carlisle, 94 Mo. 166; Williams v. Railroad, 112 Mo. 485; Wolff v. Ward, 104 Mo. 145. (4) The time for filing motions for new trial and in arrest of judgment in criminal cases is the same as in civil cases. State v. Brown, 206 Mo. 501; State v. Fawcett, 212 Mo. 729. (5) Evidence as to when a motion for new trial

and in arrest of judgment was filed should appear in the record proper and not in the bill of exceptions. Crasland v. Admire, 149 Mo. 650; Lawson v. Mills, 150 Mo. 428; Storage Co. v. Glasner, 150 Mo. 427; Butler Co. v. Graddy, 152 Mo. 441; St. Charles ex rel. v. Deemer, 174 Mo. 122; Williams v. Harris, 110 Mo. App. 538; State ex rel. v. Holland, 116 Mo. App. 347. (6) The information clearly embraces every essential allegation necessary to constitute the offense of murder of the first degree, and is in such form as has repeatedly met the approval of this court. State v. Clay, 201 Mo. 686; State v. Zorn, 202 Mo. 45; State v. Lang, 201 Mo. 673; State v. Barnett, 203 Mo. 652.

ROY, C.—For the killing of Mont Hall on July 15, 1912, defendant was convicted of murder in the first degree and sentenced to death. He and Harvey Schrum about eight o'clock in the morning of that day went to a lake in the outskirts of the village of Iron Mountain. Defendant had a repeating Winchester rifle. Harvey Schrum had a shot gun. They shot and killed Gent Gibson and Mont Hall.

**Murder.**

On his trial in his direct examination he stated that he did not know his age; that the people who "raised" him said that he was thirty-eight years old; that he was raised by Samuel Schrum. That he was an orphan and never knew any other name until he was married, when they told him that his name was Laws. That he sometimes went by the name of Sink, which was his mother's name before she was married. He had been married seventeen years.

Harvey Schrum is a son of the defendant's wife, whose maiden name was Thurman, and she testified "Harvey Schrum or Harvey Thurman is his name." When she was asked Harvey's age, an objection by defendant was sustained.

Five or six witnesses testified as to defendant's good reputation and there was no evidence to the contrary. The reputations of Gibson and Hall for peace and quietude were to some extent impeached, and there was no effort on the part of the State to sustain them. Hall and Gibson lived about two hundred and fifty yards from the defendant. The defendant and Harvey Schrum worked at Graniteville several miles away.

Nellie Schrum, a daughter, sixteen years of age, was at home with the mother. The mother and daughter and several other witnesses in the neighborhood testified that on Tuesday morning before the killing, which was on Saturday, in the absence of the defendant, Hall and Gibson appeared at the home of the defendant and scurrilously abused the wife and daughter, making lascivious proposals to the wife, saying that they had a dollar for her and for her to meet them in the wood, as she had done before, and made threats against the defendant. That evidence was not contradicted.

Mrs. Schrum testified that she then sent for her husband to come home, and that on Thursday morning between ten and eleven o'clock, Gibson, with a gun on his shoulder, passed her house and looked and pointed at it and laughed like he was going to shoot in the house.

Thursday evening defendant and Harvey got home and were told by Mrs. Schrum what Hall and Gibson had done. Shortly after, the defendant and his daughter appeared at the home of Wm. Thurman, who lived in the immediate vicinity. He had a pistol with him. He and his daughter testified that his purpose in going there was to sell chances on a revolver that he was raffling off. Thurman and his wife testified that he said, "We are out hunting for these fighting people," and Thurman also testified that soon after defendant left he heard sounds of trouble in the direction of Gibson's house and heard a voice like defendant's

say, "Come on, you G— d—— s——of-a-b——, I want all of you, I want to see all of you," followed by the report of a shotgun and then by what sounded like two pistol shots. The testimony of the defendant, his wife and daughter and several other witnesses was to the effect that Gibson was the aggressor in that difficulty and that Gibson's wife ran out of the house and caught hold of him. The State did not put her or any other witness on the stand to give any other version of that difficulty. That night defendant left home and went to Graniteville and borrowed a Winchester repeating rifle, and on Friday forenoon procured shells for it, remaining in his home during that afternoon.

Defendant and Harvey on Saturday morning went to the lake with their guns, in company with Mr. Lowe. Gibson, Hall, Mr. Forshee and Hale were at the lake on the levee; Forshee and Hale were fishing. As the defendant and Harvey approached the dam, Hale said, "There comes the Schrum boys and they have got their guns," and Gibson said, "All right." Gibson and Hall were sitting on the slope of the levee. Hale was called to breakfast and started to his house about 120 feet away. Hale testified that he said to the defendant, "You've a fine looking gun there; there's some fishing down at the falls that you can get pretty easy," and the defendant answered, "Yes, I've a couple of fish I am going to get on my string damn shortly." Forshee stated that at that time Gibson had a gun which was lying on the levee about three feet from him. At that time there was a dog fight, which all parties assisted in quelling, and Gibson resumed his seat on the levee slope, while Hall and Schrum were standing on the top. Forshee testified that after a few minutes Jim Schrum said to Gibson, " 'Well, Gibson, we have come after you, we want to settle with you; we are tired of the shooting around,' and 'so much shooting,' something about shooting, so Mr. Gibson said 'all right,' and made a move to get up, slowly.

He drew his hand back kinda on some rocks and got about half straight; and I looked back and Jim Schrum drew his gun up and the gun fired and Gibson fell. Then Hall, he broke to run, and run down off of the levee into the bottom part below the levee, and made a straight, direct course for Hale's house—there is a little gradual slope from there to Hale's house, not much, though—and after he got fifty or sixty feet away, or a little better, one of the Schrum men, I don't know which one said this, but one of them said, 'Pour it into him.' Well, both of the guns fired, right quick together [indicating by slapping hands together], so quick that I didn't know which one fired first, but I found out later when the doctor came.'' He also testified that Gibson made no effort to get hold of the gun at the time of the shooting.

Doctor English, who held the autopsy, testified that both Gibson and Hall were shot in the back with bullets and that Hall had a large number of small shot in his back. The defendant testified that he went to the lake that morning for the purpose of fishing and that, as he passed Hale, Hall said, ''Jim has got a twenty-two and the boy has a shotgun, but he won't use it,'' and that Gibson was sitting on the rock with a shotgun between his knees. That Gibson then started to get up and throw his gun on defendant just as defendant swung his gun on Gibson, and that defendant then shot Gibson. That Hall then drew a revolver on defendant and that a shot was fired behind Hall, but by whom defendant could not say. That as the boy shot Hall, Hall turned his back and he then shot him in the side just as Hall was turning from the defendant to the boy.

There were instructions for murder in the first degree and self-defense and all other instructions usually given. An instruction on murder in the second degree asked by defendant was refused. The court properly instructed on good character, and refused an

instruction on that subject asked by defendant. After the jury were sworn to try the case, and after a witness was sworn on the part of the State, counsel for defendant said: ''Now, if your Honor please, we desire to object to this case being tried at this time, for the reasons that there were two informations pending against this same defendant and that they should have both been tried at one time, on the ground that he has already been tried on one of the informations.'' Which objection was overruled.

The Attorney-General briefed this case on the point that there was no bill of exceptions properly filed in the case. Pursuant to an order of this court the original bill of exceptions and a certified **Bill of Exceptions.** copy of the record proper have been filed. On an inspection of them we feel justified in examining the proceedings on the trial as shown by the bill of exceptions. There is no assignment of errors or brief in behalf of appellant. We find no error in the admission or rejection of evidence.

I. Defendant's instructions on murder in the second degree was properly refused. The provocations given to defendant on Thursday night and prior thereto were too remote to authorize the jury **Cooling Time.** to find that the killing was reduced to murder in the second degree by reason of it. Two nights and a day had intervened between the provocation and the killing. That was, under all the authorities, more than sufficient cooling time. In State v. Bulling, 105 Mo. l. c. 222, it was said, ''This passion, thus produced, is a statutory concession to the frailty of human nature; but before it can operate to mitigate a homicide from murder of the first degree to murder of the second degree, the party acting under its influence must act *suddenly* and before he has time to reflect.'' In that case only a half hour had intervened. Bishop's New Criminal Law, vol. 2, says that an hour has been held

sufficient cooling time, and that if a night has intervened it is sufficient. There was no provocation at the time of the killing. It was either murder in the first degree or justifiable homicide on the ground of self-defense. The court instructed on both those questions.

II. The point is made in the motion for a new trial that the court should not have admitted evidence as to the killing of Gibson. That evidence **Res Gestae.** went in without objection so far as we can discover, and, moreover, such killing was a part of the *res gestae* and properly admitted.

III. The refusal of defendant's instruction on good character was not error, for the reason **Instructions.** son that the court gave a proper instruction on that subject.

IV. Appellant contends in his motion for a new trial that the State's counsel in his argument called defendant a murderer and an assassin. Nothing is said about such alleged misconduct except in **Motion for** that motion. An allegation in such motion does not prove itself. The bill should have stated that such misconduct did occur, and in the absence of such statement we must presume it did not occur.

V. Complaint is made that defendant was tried in this case at the same term and after he had been convicted of killing Gibson. The cause was set down **Trial on Two** for trial on a certain day. The jurors **Informations.** were impaneled and sworn and the State proceeded to introduce its evidence before any objection was made to proceeding with the trial. The only objection then made was that the two cases should have been tried at the same time, and that the other case had already been tried. It was not then claimed that the fact that defendant had been tried on one information would in any way prejudice him on

the second trial. The defendant was in jeopardy after the jury were sworn, and the failure to try him then would have resulted in his discharge without trial. If counsel were of the opinion that the defendant could not be fairly tried at that time, application for delay or a continuance should have been made before the jury were sworn.

We affirm the judgment and direct that the sentence pronounced by the trial court be executed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.