STATE v. JAMES LEE ROBINSON, Appellant.—No. 39264.—185 S. W. (2d) 636.

Division Two, February 5, 1945.

Rehearing Denied, March 5, 1945.

*I. Joel Wilson* for appellant.

*Roy McKittrick*, Attorney General, and *Harry H. Kay*, Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant was convicted of murder in the second degree in the circuit court of the City of St. Louis and his punishment assessed by the jury at imprisonment in the State penitentiary for a term of fifteen years, for shooting with a pistol and killing one Alonzo Harris on March 6, 1943. The cause was tried in November, 1943, but not submitted on appeal in this court until the current January call, 1945. The first assignment of error in appellant's brief complains that the trial court erred in failing to instruct the jury on the crime of manslaughter as a part of the law of the case,

under Sec. 4070(4)[1], despite the fact that appellant made no request for such an instruction and interposed no objection or exception at the trial to its omission. Other assignments complain of the giving of an improper instruction and the refusal of proper instructions on self-defense.

Preliminarily we note that the State's brief, filed on December 19, 1944, raises the point that the record failed to show any order by the trial court granting an appeal in the cause, in consequence of which this court is without appellate jurisdiction. But thereafter appellant filed suggestions in diminution of the record and a writ of certiorari was issued, in response to which the clerk of the trial court sent up a certified "full, true and complete copy of the record" for February 11, 1944, which shows that appellant filed his affidavit for appeal praying the court to grant him an appeal to this court from the judgment rendered, "which said appeal is by the court granted." It is further shown that at the same time the court sustained appellant's motion to appeal as a poor person. We think this record takes out of the case the point raised by the Attorney General.

With reference to appellant's assignment that the trial court erred in failing to instruct on manslaughter in conformity with Sec. 4070(4). This court en banc has ruled that under the statute such an instruction should be given if there is any substantial evidence upon which to base it, even though appellant failed to request it or to object or except to its omission—if he presented the point in his motion for new trial. State v. Burrell, 298 Mo. 672, 678(I), 252 S. W. 709, 711(1). The record here shows the point was preserved in the fifth assignment in his motion for new trial. So we hold the issue is before us, in which view the Attorney General tacitly concurs for he has briefed the question on the merits.

This calls for a review of the evidence. The homicide grew out of a quarrel at a crap game in which a group of seven or eight young negro men were engaged at the home of Charles Lane on Carr Street in St. Louis about 3 A. M. on a Saturday night. The appellant picked up from the table a dollar that was claimed by the deceased Harris. The latter jumped up and struck appellant with his fist, or struck at him. But according to the State's evidence Harris was forcibly restrained by several in the group and inflicted no further damage (if any) on appellant, the latter likewise having been seized by others. Appellant told them to release Harris, and that he wanted to leave by the back door. The host or "game handler" Lane, warned appellant not to depart by that route because there were two savage bulldogs in the back yard. Nevertheless appellant took the chance and left.

---

[1]References to our statutes are to R. S. 1939, and the same section numbers in Mo., R. S. A., unless otherwise indicated.

The others in the group were still at Lane's home when appellant returned about 30 minutes later, knocked on the front door, and asked, "Where's the boys?" Lane falsely told him all had gone. Appellant said "Don't lie to me", and pressed Lane for the truth, but the latter stuck to his false statement, whereupon appellant left. His manner at the time was "rough", but to all appearances he was unarmed. Some ten minutes later the others, including the deceased Harris and another boy named Styles, departed, this being some 40 minutes after the original altercation. The next testimony accounting for appellant's subsequent movements came from Alonzia Bohannon, the common-law ▬▬ wife of the deceased Alonzo Harris. She said appellant came to the kitchen door of her home on the second floor at 2307 Franklin Avenue "somewhere around three o'clock." She asked who it was and understood the person outside to answer, "Alonzo." Having opened the door, she saw the man was not Harris and slammed it closed whereupon appellant left, saying "I am not going to hurt you lady."

The boy Willie Styles, who testified as a State's witness and who, as previously stated, had left Lane's home where the crap game occurred with the deceased Harris, said he and Harris went to a restaurant at 2211 Franklin Avenue for lunch. Afterwards they went out in front. Styles testified he saw the appellant and exclaimed "There comes Jack!" Appellant entered the restaurant without saying anything and Styles followed him and bought some tobacco. Appellant ordered chili but there was none. Presently he went out and reached for his bosom, commencing to shoot with a revolver as he emerged and saying "I got you now." Harris was standing on the outside of the curb of the walk about 8 feet from the front door. He was struck by three of the bullets, one entering his back, with fatal results. He had both hands in his pockets but was unarmed. Appellant ran away. No pistol belonging to Harris was ever found but appellant's counsel by innuendo in cross-examination sought to suggest it had been hidden by Styles soon after the shooting.

Some of the details of Styles' testimony were contradicted by another State's witness, Richardson, who said he sat next to the deceased Harris in the restaurant and went outside and stood with him a few minutes. He denied seeing Styles at all; and further denied seeing appellant either in the restaurant or outside until appellant walked out of a "gangway" or alley, saying "Alonzo, I got you," pulled a pistol out of his shirt and fired four shots. But a waitress in the restaurant corroborated Styles as to appellant's being in there just before the shooting occurred. Appellant himself confirmed this testimony except that at the trial he testified the deceased was armed and that he shot in self-defense. Richardson agreed with Styles that the deceased Harris was to all appearances unarmed and made no hostile demonstration.

Police officers were summoned to the scene of the homicide at 3:25 A. M. They found Harris lying in a doorway at 2213 Franklin Avenue and one door west of the restaurant (beyond and in the direction of the alley). He was not armed. The officers arrested appellant some 45 minutes later at his home. He admitted the homicide with the revolver offered in evidence (because of "trouble" with Harris) and directed the officers to the dresser drawer in which the weapon was found. He did not claim self-defense, and made and signed a written statement which is called for by the bill of exceptions but not inserted.

John Arthur Jones was a witness for the defense. He was at the crap game, and testified to a much more violent assault by Harris upon the appellant than that detailed by the State's witness Lane. He said Harris knocked appellant against the wall, rendered him unconscious for 3 or 4 minutes; and then broke loose from those who were restraining him and attempted to strike appellant with a pitcher but that the blow was diverted by a wire leading to a radio and by appellant's arm, whereupon appellant forced his way out the rear door into the back yard. As he was going out the deceased Harris kicked him. The witness stated the conclusion that Harris "was going to hurt him, he was going to try to kill him if he could." He further declared that Harris said, "Later on I will get you."

The appellant testified that during the quarrel at the crap game the deceased Harris struck him on the jaw knocking him down, and then on the shoulder with a water pitcher which he threw, after which appellant escaped out the back door risking, but evading, an attack by the two bulldogs. He declared "They were going to beat me to death anyway;" and that as he went out Harris said, "I will get you." Lane had told him Harris was a bad man, and had killed a fellow the year before.

Continuing, appellant narrated that he went home and got his pistol, fearing he would meet Harris somewhere. Then he went to the home of his friend "Donnell," on the second floor of No. 2307 on an unnamed street intending to spend the night there. In that connection he told about a woman coming to the door, slamming it, and of his telling her he wouldn't hurt her. This checked with the previous testimony of the deceased Harris' common-law wife Alonzia Bohannon, heretofore mentioned. But she denied knowing any man named "Donnell" Cole living on the second floor at her address, and we find no testimony except appellant's that there was such a person there or elsewhere.

Appellant said he next went to Lane's home where the quarrel occurred, and asked for "Marty" and "Bostick." He explained he wanted to collect some money he had loaned them in the crap game. Being informed they had gone to the restaurant at 2211 Franklin, he proceeded there and saw Styles and the deceased Harris standing

outside. At that time there was no demonstration on the part of either adversary. Appellant went in, ordered but did not get some chili, and came outside. Thereupon, he said Harris reached in his front pants pocket; "pulled a gun"; said "I got you now, Jack;" and advanced toward him. Appellant then shot Harris four times, self-defense being his only purpose.

Thus it will be seen appellant's own testimony not only fails to show, but actually disclaims, any heat of passion. His sole stated defense at the trial was cool blooded self-defense. Nevertheless he argues the State's evidence as well as his own testimony and that of his witness John Arthur Jones, show a provocative physical assault was made upon him at the crap game by the deceased Harris some 30 or 40 minutes before the homicide. And he contends that despite his own disclaimer of hot blood engendered by that previous assault, an in-, struction on manslaughter should have been given, under such decisions as State v. Creighton, 330 Mo. 1176, 1194, 52 S. W. (2d) 556, 562; State v. Wright, 352 Mo. 66, 74, 175 S. W. (2d) 866, 871 (4, 5); State v. Bongard, 330 Mo. 805, 51 S. W. (2d) 84; and State v. Biswell, 352 Mo. 698, 708, 179 S. W. (2d) 61, 65 (5).

In view of the testimony of appellant and his witness Jones as to the previous assault upon him, the foregoing cases sustain his contention that a manslaughter instruction should have been given—unless the time intervening between the assault and the homicide constituted a cooling period sufficient to require us to declare as a matter of law that there was no heat of passion. But before we decide that question we must determine the rules by which the inquiry is to be governed.

The doctrine announced in the Bongard and Biswell cases, supra, following the early leading case of State v. Starr, 38 Mo. 270, 277, is that the grade of the homicide will not be reduced to manslaughter by mere insulting words or actions of the deceased, however grievous, if they fall short of an actual assault—violence to the person. In other words, the mental reactions of the accused are standardized. It makes no difference that mere epithets or insulting actions alone would arouse heat of passion in the particular defendant because of his personal or peculiar temperament. Physical violence is necessary in all cases. Otherwise, each would be decided on its own facts and according to the idiosyncracies of the particular judge. A premium would be put on turbulent tendencies, and more reserved and law abiding citizens would be denied the equal right to invoke manslaughter.

But how is it when the effort is the other way—that is, when the defendant's prima facie right to invoke manslaughter has been established and it is sought to take it away on the theory that sufficient time had elapsed for his hot blood to cool? Are his reactions then similarly standardized? Generally it seems they are not, though it is said in some jurisdictions that if *sufficient* cooling time, or *presump-*

*tively* sufficient time, has elapsed, the homicide will not be attributed to heat of passion but to malice, even though the accused's ·passion actually did not cool. 29 C. J., sec. 133, pp. 1147-8; 40 C. J. S., sec. 54, pp. 917-918; 26 Am. Jur., sec. 24, p. 170.

The second of these texts cites State v. Farris (Mo., Div. 2), 6 S. W. (2d) 903, 904-5(1), and that decision does support them. This is also true, apparently, of State v. Davis (Mo., Div. 2) 34 S. W. (2d) 133, 135(6). The section in 29 C. J., supra, cites three Missouri decisions[2] which respectively held that a cooling period of several weeks, several days, or two nights and a day, are as a matter of law a sufficient cooling time. Other cases say the same, respectively of two days, a day, and even six hours.[3] And we agree that a period ▮▮▮ of such long duration would be legally conclusive. On the other hand, when the provocation immediately or closely precedes the homicide many cases hold as a matter of law that the accused can invoke manslaughter. But when the cooling period lies between these limits and is a substantial number of minutes, or an hour or two, will the law erect an arbitrary standard of, say, 30 minutes or an hour? And if it be said, in order to avoid commitment to a theory so fanciful and inelastic, that a sufficient cooling time is one long enough to ·permit reason to reassert itself, how will its duration be determined?

The doctrine in these closer cases is practically universal that all the circumstances may be considered. They include not only extraneous facts, such as the length of the cooling period and the' violence of the assault, but also the showing made as to the effect on the accused as an average man, and whether he was in fact in heat of passion when he committed the homicide. So there is no standardization of his mental reactions except in a qualified sense. When the cooling period is very long or very short the court may hold as a matter of law that it was sufficient in the one case and insufficient in the other. Where it is between these limits the test is reasonableness under the evidence and the question usually, but not always, is for the jury. This is shown by the texts and the Farris and Davis cases cited in the last two paragraphs, and by several other Missouri decisions.[4]

Of the cases just cited in the margin, the Woods case refused to'

---

[2] State v. Privitt, 175 Mo. 207, 229-30, 75 S. W. 457, 463; State v. Jones (Mo., Div. 2), 217 S. W. 22, 23; State v. Schrum, 255 Mo. 273, 279, 164 S. W. 202, 204.

[3] Bond v. Williams, 279 Mo. 215, 222, 214 S. W. 202, 204, 16 A. L. R. 555; O'Shea v. Opp, 341 Mo. 1042, 1052(2), 111 S. W. (2d) 40, 46; State v. Grayor, 89 Mo. 600, 605, 1 S. W. 365.

[4] State v. Woods, 97 Mo. 31, 34-5, 10 S. W. 157, 158; State v. Grugin, 147 Mo. 39, 51, 47 S. W. 1058, 1061, 42 L. R. A. 774, 71 Am. St. Rep. 553; Bond v. Williams, supra, 279 Mo. l. c. 221, 214 S. W. l. c. 204, 16 A. L. R. 755; State v. Connor (Mo., Div. 2), 252 S. W. 713; State v. Delbono, 306 Mo. 553, 561, 268 S. W. 60, 62; State v. Houston (Mo., Div. 2), 292 S. W. 728, 731(10); State v. Perno (Mo., Div. 2), 23 S. W. (2d) 87, 89(6); State v. Crouch (Mo., Div. 2), 124 S. W. (2d) 1185, 1186-8.

hold a cooling time of 10 or 15 minutes was as a matter of law *in*-sufficient to defeat the defendant's claim of manslaughter. The Connor case ruled the adequacy of the same period was a question of fact for the jury, and that an instruction on manslaughter should have been given. The Crouch case held as a matter of law that a 15 minute period was sufficient in the light of the defendant's acts and conduct showing he was not in hot blood; and that the evidence therefore did not justify a manslaughter instruction. In the Houston case there was a quarrel in a dance hall. The deceased got a gun and fired into the roof. The lights went out and the defendant and all the others scrambled outside. *Very soon* afterward the disturber came outside the door and the defendant shot him. The decision ruled the evidence did not call for an instruction on manslaughter because there was no evidence that the defendant was gripped by an uncontrollable passion. (It ignores the point that no personal violence had been inflicted on him.)

The Grugin case was exceptional. A father learned about 9 or 10 o'clock A. M. that his 16 year old daughter had been raped a month earlier by her brother-in-law. He killed the rapist about 3 or 4 o'clock that afternoon, the intervening period being five hours at least. Held: because of the particular facts that the cooling time was not as a matter of law sufficient to bar the defendant's right to an instruction on manslaughter. The Bond case was a suit for damages for an assault committed upon an attorney by the defendants because of his abuse of them in his argument at a court trial in which they had testified as witnesses. The cooling time after the argument was about 1½ hours. The court ruled proof of his argument was competent evidence notwithstanding, on the question of malice and punitive damages. In the Delbono case a cooling time of less than 40 minutes was held sufficient to bar manslaughter because the evidence showed the defendants did not kill in heat of passion. In the Perno case the cooling time was 30 or 35 minutes and the same conclusion was reached on the same grounds.

For the sake of clarity this further fact probably should be noted. In the Privitt and Schrum cases cited above in marginal note 2, the question was on provocation sufficient to reduce the grade of an intentional homicide from first to second degree murder—not manslaughter. In ▮▮▮▮ such cases the provocation need only be "just" as distinguished from "lawful" or "adequate"; and may consist merely of insulting words or actions without personal violence. State v. Bulling, 105 Mo. 204, 221, 15 S. W. 367, 371. Such provocation ordinarily would be less inflammatory and therefore less lasting, it seems, than if it had been accompanied by personal violence as required to reduce the crime to the lowest grade of homicide—manslaughter. At least the law makes that distinction. So we keep it in mind in ruling the question presented here.

What are the facts? The evidence most favorable to appellant does show a violent assault was committed upon him by the deceased at the crap game; and that he fled through the back yard despite the two dogs. But he does not claim to have suffered much or lasting physical injury. As heretofore recounted, he went directly to his home; got his pistol; and then proceeded to the place where Harris lived; thence back to Lane's home where the crap game occurred; and then to the restaurant where the homicide was committed. His movements apparently were methodical and cool blooded, and he gives an innocent reason for all of them. He passed Harris and Styles as he entered the restaurant, but nothing was said or done by any of them. He asked the waitress for chili, but there was none. Then he talked to her for about five minutes until he went outside, where Harris advanced threateningly, attempted to draw a pistol and said "I got you now, Jack." Then he shot him in self-defense. Certainly there was nothing in the after-movements of the appellant to indicate heat of passion. According to the State's theory he was stalking his prey.

If there were anything substantial even in the State's evidence to show heat of passion during this intervening period, we would give him the benefit of it. But the only two particles of testimony that could possibly have the slightest bearing on that question are: that Lane said appellant's manner was "rough" when he returned to his house; and Richardson said appellant came out of the gangway, or alley, when he shot the deceased, thus indicating he had been lying in wait. Appellant denies this as do all the other eyewitnesses, but even if it were true it would indicate deliberation rather than heat of passion. Under the authorities cited and discussed above, we are unable to find any valid reason for holding an instruction on manslaughter in heat of passion should have been given.

The next two assignments complain that the State's instruction No. 3 on self-defense failed to inform the jury of the principle that an accused so acting is not required *nicely to gauge* the amount of force necessary to avert the threatened assault upon him; and in refusing appellant's requested instruction C employing that expression. The State's criticised instruction No. 3 was as follows (italics and paragraphing ours):

"The Court instructs the jury that the right to defend one's self from danger is a right to which a person may have recourse under certain circumstances and conditions, in order to prevent an apprehended injury to himself by another. Therefore, if you believe and find from the evidence in this case that at the time the defendant *shot* Alonzo Harris, if you find he did so shoot him, he had reasonable cause to believe, and did believe, that said Harris was about to take his life or to do him some great personal injury, and if you further believe and find from the evidence that he had reasonable cause to believe, and did believe, that it was necessary for him to *so shoot* said

Alonzo Harris, in order to protect himself from such danger, and that he had reasonable cause to believe, and did believe, that it was necessary to use such means to protect himself, then he *ought to be acquitted* on the grounds of self-defense.

"Whether the defendant had reasonable grounds to believe that such danger existed and whether he shot Harris in the honest belief that it was necessary for the protection of his life or person, are questions which you must determine from all the evidence in the case. Although the defendant may have really believed himself to be in danger, yet he cannot be acquitted on the ground of self-defense unless it further appears from the evidence that he had reasonable cause for such belief. On the other hand, even if no real danger existed, yet if the defendant had reasonable cause to believe, and did believe that it existed, he would be justified in acting upon such belief. If you believe from the evidence that the defendant shot the said Alonzo Harris unnecessarily, if you find he did so shoot him, when he did *not* have reasonable cause to believe that the said Harris was then about to kill him, or do him some great bodily harm or personal injury, then there *is no* self-defense in the case and you cannot acquit the defendant on that ground."

This instruction is substantially a counterpart of one held erroneous in State v. Traylor, 339 Mo. 943, 947, 98 S. W. (2d) 628, 631, solely on the ground urged here, all the members of this Division concurring. But on further reflection we all are of the opinion that the conclusion reached in that case was wrong on its facts, or at least ought to be modified. The Traylor case was based on State v. Creed, 299 Mo. 307, 320, 252 S. W. 678, 682(6) ; and the latter was founded on State v. Hopkins, 278 Mo. 388, 394, 213 S. W. 126, 128(4). In the Hopkins case (for felonious assault) the prosecuting witness had a billy club and the defendant hit him with a rock. The instruction given for the State told the jury "no one is justified in using more force than is necessary to get rid of an assailant." The decision held this was erroneous and misleading, saying that a person is not required nicely to gauge the amount of force necessary to repel an attack. The State's instruction 8 in the Creed case also contained the offending language quoted above, and the decision held a cautionary statement exempting the defendant from nicely gauging the force should have been included in the instructions. Furthermore, in that case three brothers shot and killed a policeman who had struck one of them with his club, and there was a real question whether it was necessary for them to go to the excessive length of shooting him.

But in the instant case the appellant's testimony showed that the deceased Harris was attempting to shoot him when he shot Harris. And the criticised instruction 3 does not contain any statement denying the appellant's right of self-defense if he used more force than was necessary. On the contrary, the instruction dealt specifically with the

facts of the case, and expressly declared that if the appellant had reasonable cause to believe and did believe it was necessary for him to *shoot* Harris in order to protect himself, then he ought to be acquitted on the ground of self-defense; and the second paragraph declared the converse. In so declaring the instruction plainly *assumed* the shooting of Harris was not excessive force—if an act of self-defense was reasonably necessary at all. It left no issue on that point, and there was no need for any cautionary statement about the *amount* of force. For these reasons we hold it was not erroneous.

Finding no error in the record, the judgment is affirmed. All concur.