STATE OF MISSOURI, Respondent, v. J. O. PARKER, Appellant.—No. 40611.—214 S. W. (2d) 25.

Division Two, October 11, 1948.

*Norman, Foulke & Warten* for appellant.

*J. E. Taylor,* Attorney General, and *John S. Phillips,* Assistant
Attorney General, for respondent.

[25] TIPTON, P. J.—The appellant was convicted of murder in the second degree in the circuit court of Jasper County and his punishment was assessed at 20 years' imprisonment in the state penitentiary.

Appellant contends that the evidence is insufficient to sustain the verdict. We will therefore set forth the facts most favorable to the State to determine this question. The appellant was the owner of a three-apartment building facing on Pearl Street in Joplin, Missouri. The downstairs constituted [26] one apartment and it was occupied by the appellant; the upstairs was divided into two apartments. The east apartment was occupied by the deceased, Robert Turner, and his wife, and consisted of three small rooms and a bathroom. It had hardwood floors which enabled a person in appellant's apartment to hear a person walking about in the apartment above. In addition to the wooden front door to deceased's apartment, there was a screen door which, upon being released by a person passing through it, would slam. There was a sidewalk leading from deceased's apartment to the sidewalk along the street. There was also a sidewalk leading from the front door of the apartment occupied by the appellant.

Deceased and his wife rented the apartment furnished in the early part of October, 1945. Almost immediately after they moved into this apartment the appellant insisted on and did make frequent officious inspections of the apartment for the pretended purpose of examining the ice box, faucets, bath fixtures and furniture. Deceased and his wife objected to these intrusions, but he continued to make inspections, even though the deceased and his wife were absent. During one of the inspections in the middle of October of that year he discovered Mrs. Turner's niece who was visiting her for the afternoon. He became highly incensed and demanded to know who she was and ordered her from the building. Later, he ordered the deceased and his wife to vacate the apartment and attempted to rent it to a third party from whom he accepted a month's rent which he later had to return. Appellant gave deceased a notice to vacate, but this notice was held by the local rent control board to be insufficient to comply with the rent regulations. Later, he made two other trips to the board seeking the right to eject deceased and stating as reasons therefor matters personal to him. He was told by the rent officials that none of the reasons were sufficient under rent regulations to evict deceased. As he was leaving the office he said, after a heated discussion, "Well, I will get the son-of-a-bitch out."

On December 22, 1945, appellant made another tour of inspection in the absence of deceased and his wife and as he left he picked

up three cushions from the sofa and took them with him. This rendered the sofa useless to deceased and his wife. When deceased came home from work, he and his wife went to the front door of the appellant's apartment and knocked. The appellant came to the door and deceased asked him to return the cushions so they could use the sofa they had rented from him. Then the appellant, who was much larger though older than the deceased, struck him in the face, causing his mouth to bleed. They clinched in the front door and, according to appellant's wife, she pulled the men back into the front room of her apartment and they fell upon the floor. A passer-by separated them and the deceased and his wife returned to their own apartment.

The appellant's version of the trouble was that deceased was the aggressor, that he knocked the appellant down, beat him with his fists and "kneed" him, fracturing ribs on his left side, although he did not seek or receive medical treatment for these injuries. The county physician testified that appellant had not sustained such injuries. The appellant admitted that after the encounter he always went armed with the Smith and Wesson revolver with which the homicide was committed.

On Thursday, December 27, 1945, the deceased ate breakfast with his wife after which he walked around the apartment for a while. Then between 9:30 and 10:00 o'clock, as was his custom, he left to go to his place of business. He passed through the front door, the screen door slammed, and he descended the steps to his walk and started east toward his car which was parked at the Pearl Street curb. He was looking down as he walked, smoking a cigarette, and had his car key in his hand. Meanwhile, the appellant left his apartment by the way of the front door but he did not let the screen door slam. He stated he was going to look at the furnace, though he could have gone directly from his apartment to the basement. He had his revolver in the right hand pocket of his overcoat. He started north along the flagstone walk close to the house and toward the northeast corner of the building, which corner the deceased was approaching from the west. Deceased passed the corner [27] of the house a few steps until he was about five feet from his car when the appellant made some noise or movement which caused the deceased to turn his head and body to some extent to see what was behind him. As he did so the appellant fired a shot from his revolver that struck the deceased in the right eye. He died instantly.

The appellant made various statements to the officers in which he claimed he shot deceased in self defense. He contended that when deceased turned he grabbed appellant and reached toward his right hip pocket. It later developed there was no weapon there, nor did he have one upon his person. In fact, he did not own one. There were no powder burns upon deceased.

There is substantial evidence to support the verdict of guilty of murder in the second degree. The appellant admitted that he shot and killed the deceased intentionally. Evidently the jury did not believe that he killed the deceased in self defense. This assignment is without merit.

The appellant assigns as error the fact that the trial court refused to admit the testimony of Frank Seay that deceased had a "reputation for being a violent and turbulent man and having that kind of a disposition." It is the State's contention that this evidence was properly rejected because it was not shown that appellant knew of such reputation at or prior to the time of the killing. Appellant was placed upon the stand prior to witness Seay. While upon the witness stand the appellant was asked if he had heard deceased's reputation discussed with regard to whether deceased had rough, violent or dangerous disposition. The State objected to this question because it was leading and because of his previous testimony which the court had told the jury to disregard. The State's objection was sustained. Then the appellant was asked if up to the time of the shooting he had heard his reputation discussed. He answered that he had heard deceased was a "pretty rough customer." On a motion to strike by the State, the court overruled the objection and stated that it would permit the answer to go in. We hold that appellant's answer was equivalent to showing that he knew of deceased's reputation as a violent, turbulent man and, therefore, Seay's testimony should have been admitted. Evidence that deceased bore the reputation of having a turbulent or violent disposition or character is competent where, as here, the defense is self defense. State v. Naylor, 328 Mo. 335, 40 S. W. 2d 1079; State v. Turnbo, 267 S. W. 847; State v. Roberts, 294 Mo. 284, 242 S. W. 669.

We also believe the court should have given instruction No. 2, which is as follows:

"If the jury believe from the evidence that the deceased was of rash, turbulent and violent disposition and that defendant had knowledge of such disposition, then it is a circumstance for the con- consideration of the jury in considering the reasonable cause for defendant's apprehension of great personal injury to himself."

The identical instruction was refused in the case of State v. Hicks, 27 Mo. 588. We held this to be reversible error.

Appellant also contends that his request for an instruction on manslaughter should have been given. Appellant recognizes the law that opprobrious and threatening words accompanied by gestures do not reduce the grade of homicide—nothing short of an actual battery permits the inference of provocation and passion reducing the offense to manslaughter (State v. Ferguson, 353 Mo. 46, 182 S. W. 2d 38). But he contends that such battery did take place on Satur-

day preceding the killing on the following Thursday and, therefore, an instruction on manslaugter should have been given.

"But even a state of blood sufficiently provoked to destroy malice is of no avail to reduce murder to manslaughter, if a cooling period has intervened. In this case such a cooling period intervened. The law will not afford relief of any kind to one who, sufficient time for reflection elapsing, permits his anger to cause him to do wanton and cruel acts against another." State v. Farris, 6 S. W. 2d 903, l. c. 905-906. The cooling time in this case was from Saturday to the following Thursday. Less time has been held by us to be sufficient time as a matter of law for the cooling time. State v. Robinson, 353 Mo. 934, 185 [28] S. W. 2d 636; State v. Davis, 34 S. W. 2d 133; State v. Schrum, 255 Mo. 273, 164 S. W. 202. We hold that the court properly refused the requested instruction on manslaughter.

Having reached the conclusion that the court erred in refusing to admit the testimony of witness Seay and its failure to give appellant's requested instruction No. 2, we will not discuss other assignments of error. It follows that the judgment should be reversed and the cause remanded for a new trial. It is so ordered. All concur.