STATE OF MISSOURI, Respondent, v. EARL RIGGS, Appellant, No. 42060—237 S. W. (2d) 196.

Division One, March 12, 1951.

*Charles T. Bloodworth* and *Ted M. Henson* for appellant.

*J. E. Taylor,* Attorney General, and *James Patrick Quinn,* Assistant Attorney General, for respondent.

[197] HYDE, J.—Defendant was convicted of second degree murder and sentenced to twelve years imprisonment. He has appealed and alleges as error the refusal of his offered instruction 7D on self-defense, the failure of the Court to give a manslaughter instruction and improper arguments by the State's attorneys.

Defendant lived in Corning, Arkansas, and on the night of Saturday, December 3, 1949, went to Neelyville, Missouri, north of Corning, after visiting several taverns on the way. He was accompanied by Harry Stevens of Corning. According to defendant's evidence, he got in a crap game in a shack at Neeleyville while Stevens slept in his car. Charlie Conley, who was later killed by defendant, left the shack where they were gambling and came back after five or ten minutes.

Another man who left with him did not return. The game broke up about 4:00 A. M. Defendant went out to his car, woke up Harry Stevens and asked him if he had all his "belongings and possessions." Stevens found that his billfold was gone and defendant asked Charlie Conley if he knew anything about it. He finally accused him of knowing what happened to it because he went out of the shack while the game was going on. Defendant said Charlie Conley then made passes at him with a knife and cut a slit on his forehead and also cut his coat sleeve when he threw up his arm. Stevens called to them to forget about it, defendant backed off and they left in his car. They went to the state line where Deputy Sheriff Shelton operated a service station and reported the loss to him. Defendant washed off the blood from his cut and drank a cup of coffee before they saw Shelton who was asleep when they arrived about 5:00 A. M. After talking to Shelton, a man they knew came there, walking down the highway. At his request, defendant drove him to his home about a mile south of the state line. When defendant returned, Harry Stevens and Shelton were at the station and they all ate breakfast together. Between nine and ten o'clock, Harry Stevens went with defendant to another tavern, where defendant had previously made arrangements to borrow a shotgun. (He said he intended to go duck hunting that afternoon.) They then drove to the [198] edge of Neelyville where defendant stopped at a service station. Harry Stevens went on with another man to Townsend's tavern in Neelyville. Defendant stayed at the station until they returned; thereafter they talked a while and then Harry Stevens and his companion started home. The reason for this trip, or why defendant did not go with them to Townsend's, was not explained.

Defendant later went over to Townsend's and drank a beer. Charlie Conley was there, sitting at a table by himself, and he asked defendant if he would buy him a beer. Defendant said: "Hell no, have you forgotten this already." Defendant left him, went to the back of the room, woke up another man and talked to him awhile; defendant then came back to the front of the room, told Townsend in Charlie Conley's presence about Stevens' billfold being stolen and their reporting it to the Deputy Sheriff. Charlie Conley walked out and about that time Harry Stevens drove up with three other men, including Eddie Stevens, who testified he and defendant had arranged to go hunting together. Defendant went out to meet them and Charlie Conley, who was standing near by, spoke up and said: "Earl come on down to the house and I will get that billfold and we will stop this damn argument." Defendant said: "I will be right down." Stevens and his companions went in the tavern and defendant drove his car toward Conley's house which was 300 to 400 feet away. He saw Charlie Conley and his brother Howard Conley walking out of the yard of Howard Conley's house, so he stopped and got out. He then

related their conversation as follows: "I said, 'Boys, I didn't expect to see both of you', and Charlie spoke up, and said, 'Well by God, take a good look, we are both here', and he said, 'You are getting so damned smart around here, and we are going to work you over.'" Charlie Conley had one hand in his right jumper pocket and the other hand down to his side, but defendant could see what was in his left hand. Defendant went to his car and got the gun and some shells. He told them to stop but he said: "They began to spread out, one to my left and one to my right and advanced toward me at a walk." He testified further, as follows: "Howard Conley spoke up and he said, 'Here I haven't done anything to you, don't shoot me'. I said, 'Stop, and I won't shoot and you won't get hurt.' They kept walking and talking, coming toward me, and I told them again to stop, and they didn't do it." Defendant said he shot Charlie Conley when he was five or six feet from him. He also shot at Howard Conley who ran. Defendant got in his car and drove to Deputy Sheriff Shelton's station. Charlie Conley was found with an open knife in his right jumper pocket and a hammer under his body. Defendant said the shooting occurred about 11:45 A. M.

According to the State's evidence, defendant drove up to Conley's house, got out of his car with his shotgun and said: "I am going to kill both of you"; both of the Conleys asked him not to shoot but he shot Charlie and shot at Howard as he ran. Howard Conley said they made no advances toward defendant; that defendant was about 20 feet from Charlie when he shot him; and that he did not know defendant was coming there prior to the time he arrived. Mrs. Howard Conley said defendant immediately got in his car and drove off after Howard ran. This version was to some extent corroborated by the testimony of State Patrolmen as to statements defendant made to them on the afternoon of the shooting. The patrolmen said defendant stated that the Conleys were standing there with nothing in their hands and made no advance toward him. He expressed surprise that his shot had missed Howard and said that if he had had more shells he would have got them both.

The jury was fully instructed on self-defense. The only thing contained in defendant's offered self-defense instruction which was not covered in the one given was the following clause: "and, if the defendant acted in a moment of what to him appeared to be impending danger from an assault by the deceased, it was not necessary for him to nicely measure the proper quantity of force necessary to repel the [199] assault." However, there was no issue in the case about the amount of force or the use of excessive force; and, therefore, refusal to instruct on this issue could not have been prejudicial. (See State v. Robinson, 353 Mo. 934, 185 S. W. (2d) 636; State v. Littlejohn, 356 Mo. 1052, 204 S. W. (2d) 750, which distinguished on the facts the following cases cited by defendant: State v. Traylor,

956

339 Mo. 943, 98 S. W. (2d) 628; State v. Creed, 299 Mo. 307, 252 S. W. 678; and said that the conclusion reached in the Traylor case "was wrong on its facts or at least ought to be modified.") The jury here was instructed, if defendant had reasonable cause to believe deceased intended to do him great personal injury and to "believe it necessary to use said shotgun in the way he did to protect himself", then the shooting was justifiable. Thus, since the jury were told defendant had the right to use the force and means he did use, there was no occasion to tell them any more about his right to use force or to inject an issue not in the case.

Defendant contends that a manslaughter instruction should have been given because there had been an assault and battery on defendant by deceased, citing State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) 556; State v. Littlejohn, 356 Mo. 1052, 204 S. W. (2d) 750; State v. Porter, 357 Mo. 405, 208 S. W. (2d) 240. However, in these cases the assault was nearly contemporaneous with the homicide. In the Creighton case (52 S. W. (2d) 1. c. 561) it was said: "Where the record shows personal violence—a battery—inflicted upon the slayer by the deceased at the time of the homicide, the general rule is that a manslaughter instruction is called for * * *." Here the assault occurred more than seven hours before the shooting and defendant was engaged in varied activities with other people during the intervening period. With such a cooling off period and intervening activities, there is no substantial evidence to indicate that defendant acted in heat of passion from this assault. According to the evidence, defendant either peaceably went to the Conley house to get Stevens' billfold (on deceased's invitation as he claimed) and then acted in self-defense to prevent another assault, or he went there armed and looking for deceased (as the state contended) intending to use his deadly weapon. We think the facts hereinabove stated, about defendant's intervening activities and contact with so many others over such a long period of time, conclusively show that the shooting could not have been in the heat of passion from the earlier assault. (See State v. Robinson, 353 Mo. 934, 185 S. W. (2d) 636; State v. Parker, 358 Mo. 262, 214 S. W. (2d) 25.) As we said in the Robinson case: "Certainly there was nothing in the after movements of the appellant to indicate heat of passion." We, therefore, hold that the Court properly refused to instruct on manslaughter.

The arguments of counsel are not preserved in the record but only the objections of defendant's counsel and the Court's ruling thereon appear. Five objections were made to the argument of the prosecuting attorney and there were four objections to the argument of the special prosecutor assisting him. Of the five objections to the prosecuting attorney's argument, four were sustained and one was overruled. The objection that was overruled was concerning defendant's statements to the officers as to whether the Conleys advanced

toward him prior to the shooting, on the ground that it was not true. While the Sheriff said defendant stated that they advanced but stopped when he got the gun, the patrolmen said he stated they did not advance. Therefore, from what appears in the record we think this objection was properly overruled. The other four objections were not only overruled but the jury were instructed to disregard the statements made, were told that they must recall the testimony and be guided by it, and the prosecuting attorney was rebuked and cautioned to stay within the record. No other action was requested by defendant's counsel and the record indicates that the Court acted properly, vigorously and sufficiently.

One objection to the argument of the special prosecutor was overruled, [200] two were sustained and one was sustained in part. The one overruled was concerning defendant's dancing at a tavern on Sunday morning prior to the shooting. Apparently the special prosecutor inferred that defendant was dancing with colored people. Defendant had been shooting craps with colored men (the Conleys were negroes) and several of the taverns he went to that morning were operated by and patronized by colored people. The record does not make it clear with whom he danced, so we can find no error in this ruling. As to the sustained objections the special prosecutor was also told not to argue such matters and the jury was told to be guided by the instructions given them by the Court. No further action was requested. The other objection related to the state's efforts to show convictions of defendant in Michigan which he denied. (A conviction for extortion in a Federal Court in Arkansas was admitted.) The special prosecutor improperly stated (apparently) his opinion that defendant was not telling the truth about the Michigan cases and defendant's counsel asked that the jury be discharged. The Court's action was as follows: "THE COURT: The objection as made doesn't exactly quote the statement of attorney for the defendant, I mean the attorney for the state. One of the statements made by Mr. Kearby was that on his honor he says that he asked those questions in good faith. Now as to that part of the statement, the objection will be overruled. The objection will be sustained as to the statement made by counsel for the state as to on his honor he thinks the defendant wasn't telling the truth. It is not the province of counsel gentlemen of the jury, to testify in the law-suit. The Court has instructed you here as to the credibility of the witnesses and you are the judges of the credibility of the witnesses and you will be guided by your determination and your judgment in the matter as to the witnesses in the case. The request for the discharge of the jury will be denied and gentlemen of the jury the Court will further say to you that it is your province to determine what the evidence in the case is and apply that evidence to the instructions that have been given to you by the Court and declared to be the law in the case.

"MR. HENSON: Object—except to the Court's failure to properly rebuke the Prosecuting Attorney Mr. Kearby.

"THE COURT: The Court will say that counsel should stay within the record." From what appears in the record, we cannot say the Court's action was insufficient or that there was any abuse of discretion in refusing to declare a mistrial. We find no error in the record proper and think the whole record shows that defendant had a fair trial.

The judgment is affirmed. All concur.