**STATE of Missouri, Respondent,**

v.

**Charles Francis BOOTHMAN, Appellant.**

**No. 45486.**

Supreme Court of Missouri,
Division No. 1.

Feb. 11, 1957.

Williams & Norton, North Kansas City, for appellant.

John M. Dalton, Atty. Gen., Paul Mc-Ghee, Asst. Atty. Gen., for respondent.

HOLLINGSWORTH, Judge.

Defendant has appealed from a sentence of imprisonment in the State Penitentiary for a term of seven years imposed upon him in accord with a verdict rendered in the Circuit Court of Clay County finding him guilty of the crime of incest with his sixteen year old daughter and so assessing his punishment. Error is assigned (1) in allowing the jury to inspect during its deliberations defendant's written confession priorly introduced and read in evidence during the course of the trial and (2) in refusing defendant's motion to declare a mistrial grounded upon a statement

made by the prosecuting attorney within the hearing of the jury at the conclusion of the testimony of one of defendant's witnesses.

No contention is made that the evidence is insufficient to support the verdict. That adduced in behalf of the State, being in the main the testimony of the daughter, corroborated by defendant's written confession, tended to show:

Defendant, aged 47 years at trial time in October, 1955, was a brick mason, residing in North Kansas City, Missouri. The sixteen year old daughter (herein sometimes referred to as the prosecuting witness) was his child by a former wife, from whom he was divorced in 1943. He thereafter married a second wife, from whom, it seems, he is now separated. In the fall of 1954, the prosecuting witness, whom he had seen only once in eight years, came to live with him and his second wife. He and that wife, her three children and the prosecuting witness resided for a time on Cherry Street in Kansas City and in September or October of 1954 moved to and took up their residence in a trailer court at Linden, Clay County, Missouri. The trailer in which they resided consisted of a front room, a kitchen, a bathroom and a bedroom, arranged in the order stated. While living at the Cherry Street residence and in the trailer, defendant had sexual intercourse with his daughter a total of some eight or ten times, the last time being the date alleged in the information, to wit: the 22nd or 23rd day of December, 1954. Defendant's wife learned of the immoral relations existing between him and prosecuting witness, a quarrel ensued, defendant's wife shortly thereafter left for Oklahoma and, it seems, may have gone thence to California. The prosecuting witness returned to the home of her own mother and at trial time resided with an uncle and aunt in St. Louis County.

On the 20th day of April, 1955, defendant was arrested and lodged in the jail at Kansas City. On the following morning he talked to certain police officers and volunteered to make a written statement. A secretary and notary public in the police department, Helen K. Tyler, typed the questions as they were asked and typed defendant's answers as they were made. In that statement, consisting of one single-spaced typewritten page, appear the following questions and answers, the name of the prosecuting witness being here purposely omitted:

"* * * Q. Have you been advised of your constitutional rights— that you do not have to make a statement and that under the law you are entitled to consult with friends and attorney? A. Yes, sir.

"Q. Are you willing to waive that right and make a statement with reference to your having sexual relations with your daughter, ———— ————? A. Yes, sir.

"Q. How old is your daughter, ————? A. Sixteen.

"Q. How many times have you had sexual relations with your daughter, ————? A. Eight, nine, or ten times.

"Q. Where were you living in Kansas City at the time ———— came to live with you? A. 550 Cherry Street.

"Q. Did you have relations with her at this address? A. No, sir.

"Q. Where and when did you first start having sexual relations with your daughter? A. At the Linden, Missouri trailer camp in November of 1954.

"Q. Over how long a period of time did these acts occur? A. About a month.

"Q. How long did she live with you at the trailer court? A. From the last part of October to the first part of December, 1954.

\*     \*     \*     \*     \*     \*

"Q. On any of the occasions when you were having intercourse with your daughter, was anyone else present or did anyone else come in while you were doing it? A. I would usually have intercourse with her in the trailer court while the rest of the family was asleep.

"Q. When these acts occurred, your wife would be in bed with you and ———— at the time? A. Yes.

\* \* \* \* \* \*

"Q. How have you been treated by the Police Department while you have been in custody? A. Wonderful—they have all been nice.

"Q. Will you read and sign this statement? A. *Yes,* I have read the above statement, understand it and am signing it because it is the truth."

The statement bears the signature of defendant and the notarial jurat and seal of Helen K. Tyler and the signatures of two police officers as witnesses. Helen K. Tyler and the police officers testified that defendant was fully advised of his right not to make a statement, that he made no request for counsel, and that the questions and answers therein truly set forth the statement made by him and that it was freely given.

Defendant admitted voluntarily making a statement in the manner above described and admitted signing the paper above quoted from and writing with a pen in the space therein provided by the typist for its insertion the word "Yes" in the answer above set forth, and that he had actually read the words, "I have read the above statement", before he wrote into it the word "Yes". But he denied that the incriminating answers appearing therein were made by him and denied that he was advised of his "constitutional right not to talk with them \* \* \*." He further testified that he asked the police officers if he could have an attorney and was told he "did not have to have nobody there"; that

he was "pretty tore up (meaning, he said, nervousness from lack of sleep) that morning"; that he never told the officers he had sexual relations with his daughter; that he did not have his glasses and could not read the statement before he signed it but that he could see the typewritten line upon which he signed his name; and that he signed it because "they told me they would help me if I'd sign it \* \* \*."

The statement was thereupon admitted and read into evidence but was not then exhibited to the jury.

On cross-examination, defendant denied that he ever had sexual intercourse with his daughter. He did thrice testify, however, that he might have told the police officers he had had sexual relations with her eight, nine or ten times, but he also repeatedly testified that he told them he had not had sexual intercourse with her and that when being interviewed in the police offices he had offered to take a lie detector test.

There was also testimony in behalf of defendant by two of his stepchildren to the effect that after the prosecuting witness came into their home she said she would "go to any measure whatever to break up dad and mother"; that she stated in the presence of them and their mother that there was "nothing to" the charge she had made against her father; and that they never saw misconduct on the part of defendant toward the prosecuting witness. Defendant's fifteen year old stepdaughter testified that the prosecuting witness "never did say that daddy messed with her. She said he could have if he wanted to, but he never did." Defendant's wife was not present at the trial.

During the cross-examination of defendant's stepson, a soldier stationed at Fort Riley, the prosecuting attorney pressed him for an admission that he (the prosecuting attorney) had talked over the telephone from North Kansas City to the witness in Chickasha, Oklahoma, about certain phases of the case. The witness repeat-

edly denied that any such conversation was ever held. At the close of the cross-examination, counsel for defendant excused the witness, and inquired of the prosecuting attorney, "You have any further need for him?", to which the prosecuting attorney said, "Well, not right at this time." Counsel for defendant then said to the witness, "All right, go ahead", whereupon the prosecuting attorney said, "Mr. Sheriff, hold this man." Counsel for defendant objected to the statement. Apparently the judge had not heard it and made inquiry. The following ensued:

"Mr. Pratt (prosecuting attorney): They told him to leave. I instructed the sheriff to hold the witness. I do not want him to leave.

"The Court: Did you tell the witness to leave?

"Mr. Williams (counsel for defendant): I told him we were through with him, yes, sir.

"The Court: Well, of course, he can't leave.

"Mr. Williams: That's correct. Now, I want your record to show that we object to the prosecutor directing the sheriff to pick up and hold the witness, and all this taking place in the presence of the jury, with the obvious attempt to impeach the witness and to prejudice the jury against him, and we request that the jury be discharged.

"The Court: Did you direct the sheriff in front of the jury to hold this man?

"Mr. Pratt: I didn't want him excused.

"The Court: Well, the objection to that in the presence of the jury is sustained. Motion to discharge the jury is refused. The man is not permitted to leave anyway until you excuse him, but that is very improper for you to do that in front of the jury, and the objection is sustained; that is very improper. All right, gentlemen, call your next."

During the course of its deliberations, the jury sent a note to the judge, reading, "May the jury have the confession made by Mr. Boothman?" Over objection of defendant's counsel, the jury was called into the jury box and permitted to there examine the confession theretofore admitted and read into the evidence, following which the jury returned to its room to further consider its verdict.

■ Defendant contends that the action of the court in permitting the jury to inspect the confession during the course of its deliberations was tantamount to allowing the introduction of new evidence in behalf of the State after the case had been submitted. Clearly, defendant errs in that contention. After proof of the manner in which the statement had been taken, typed, signed and interlined with the word "Yes" by defendant and thereafter notarized and witnessed, it was introduced in evidence and had been read in its entirety to the jury during the presentation of the State's case. No contention is made that any matter appeared thereon or was revealed to the jury by inspection that theretofore had not been developed by the testimony. Unquestionably, the trial court could have legally permitted the jury to inspect it during the trial and it was invested with the exercise of a sound discretion in permitting the jury to inspect it during its deliberations. State v. Rusow, Mo., 106 S.W.2d 429, 430[2]; State v. Damon, 350 Mo. 949, 169 S.W.2d 382, 383.

Defendant says that some of the statements made therein are not words such as the defendant would use and indicate that the rest of the statement might be false and that it is difficult to believe that defendant would have admitted acts of incest in the same bed by the side of his sleeping wife or that he would volunteer to state that he had been treated "wonderful" by the police department. Defendant

then ingeniously suggests that his "counsel felt that inasmuch as the jury had never actually seen the statement and their only contact with it had been a hurried reading of the statement in a monotone, * * * it made no impression on them", and that for this reason he did not discuss the purported confession; and that any lawyer "could have made an appealing and convincing argument to the jury regarding the purported confession and its patent inconsistencies", but that defendant's attorneys were "denied this opportunity".

The argument is not persuasive. If, as defendant says, the purported statement, on its face, shows that it does not truly reflect statements actually made by defendant, then it would seem clear that the more the jury saw of it the more favorably would it incline the jury to the defendant and thereby tend to repair any damage done to defendant's case by reason of the failure of his counsel to point out in oral argument the alleged self-destructive portions thereof. Defendant has pointed out and we see no abuse of discretion on the part of the trial court in permitting the inspection requested by the jury.

Defendant finally contends that the failure of the trial court to declare a mistrial because of the prosecuting attorney's statement, "Mr. Sheriff, hold this man", was prejudicially erroneous. He has cited us to no case in support of his contention. The State's position is that the situation arose because defendant's counsel, in effect, had indicated to the witness who had just finished his testimony that he was finally excused.

The trial court is vested with the discretion to determine whether misconduct of counsel for the State during the trial of a criminal case warrants a mistrial and unless an abuse of that discretion reasonably appears the appellate courts will not interfere. State v. Wilkins, Mo., 100 S.W.2d 889, 896; State v. Riggs, Mo., 237 S.W.2d 196, 199–200; State v. Hartwell, Mo., 293 S.W.2d 313, 317.

Whatever the cause or the motive of the prosecuting attorney in making the statement, the trial court, when apprised of it, acted promptly and incisively. The sharp reprimand then and there delivered to the prosecuting attorney certainly was calculated to destroy any prejudicial effect the statement may have had upon the jury. No abuse of discretion is shown.

The judgment is affirmed.

All concur.